Reuven S. LEIBMAN, Appellant,

v.

Yana GRAND, Appellee.

No. 08–97–00307–CV.

Court of Appeals of Texas, El Paso.

Oct. 1, 1998.

---

Pamela E. George, Houston, for Appellant.

Thomas Clarke, Houston, for Appellee.

Barbara K. Runge, Houston, for Interested Party.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Reuven S. Leibman appeals from a turnover order requiring that Fidelity Life Insurance Company deliver to the duly appointed receiver the funds in Leibman's annuity account. In addition to challenging the sufficiency of the evidence to support the trial court's determination that the premium payments he made in purchasing the annuity were in fraud of his former wife and judgment creditor, Leibman attacks the turnover order on procedural grounds. We affirm.

## FACTUAL SUMMARY

Reuven Leibman (Leibman) and Yana Grand (Grand) were married in 1980 and separated in 1989. In July of that year, Grand filed a complaint in the courts of North Carolina, seeking a divorce, an equitable distribution of marital property, and alimony. On May 21, 1990, a Judgment of Absolute Divorce was granted. By November, Leibman had moved to Houston, Texas. In the spring of 1992, the North Carolina courts entered two judgments relating to the remainder of relief sought by Grand. The first, pertaining to an equitable distribution of the marital property, awarded Grand the sum of $67,733.55 with interest at 8 percent per annum. The second involved a judgment for delinquent alimony *pendente lite* in the amount of $24,636.88, together with interest at 8 percent per annum, and awarded perma-

nent alimony to Grand payable in the amount of $1,040 per month. Leibman remarried in December 1992. He made no alimony payments nor did he pay any part of the money judgments.[1]

Pursuant to the Uniform Interstate Family Support Act,[2] Grand filed a petition in the 247th District Court of Harris County, Texas to register and enforce the foreign judgments. On May 30, 1996, the trial court entered an order confirming registration of both judgments. *See* TEX.FAM.CODE ANN. § 159.608 (Vernon 1996). Grand then filed an application for the turnover of non-exempt property, and alternatively, she requested the appointment of a receiver. On December 23, 1996, the initial hearing proceeded on the turnover relief. The sole asset addressed during the testimony was the Fidelity Life Insurance Company (Fidelity) annuity. Counsel for the litigants argued the issues of whether the contributions to the annuity account constituted the transfer of non-exempt property, whether the transfer was fraudulent, and whether the annuity qualified for any statutory exception. At the conclusion of the arguments, the trial court appointed a receiver and enjoined Leibman from interfering with the financial status quo. After a bench trial on the merits, the court found that the judgments had an outstanding balance, including interest, of at least $195,500 and that Leibman had wholly failed to satisfy them. The court further found that Leibman fraudulently transferred non-exempt funds in the amount of $35,000 into the Fidelity annuity. Consequently, the trial court set aside the transfer and ordered Fidelity to turn over to the receiver the annuity funds in the amount of $41,608.45[3] so that the funds could

---

**1.** The North Carolina court made extensive findings of fact which are recited in the equitable distribution judgment. Specifically, the court recounted that during the separation, Leibman had failed to make payments of alimony *pendente lite*, and failed to make a single mortgage payment on the marital home, despite a court order to do so. During the pendency of the divorce action, he "closed out both his retirement account and his profit sharing account" and converted the funds, totaling nearly $16,000, to his personal use. Further, at the time Leibman vacated the marital residence, he took substantial amounts of personal property which he also converted to his use. Lastly, the court characterized as "economic

misconduct" Leibman's failure to produce documents during discovery and his failure to fully disclose assets in an affidavit filed with the court.

**2.** TEX.FAM.CODE ANN. § 159.001 *et seq.* (Vernon 1996 and Vernon Supp.1998).

**3.** The trial court's findings of fact reflect that Fidelity paid to the receiver $41,608.45 on February 20, 1997. At trial, however, the associate general counsel for the company testified that the contract value at April 1, 1997 was $40,374.58, which included the original $35,000 investment and earned growth of $5,374.58. There is no appellate complaint raised as to this discrepancy.

be applied in partial satisfaction of the registered judgments.

## APPLICATION OF THE TEXAS INSURANCE CODE

Leibman first challenges the turnover order by three related issues on appeal. In Issue No. One, he asserts that the trial court abused its discretion in entering the turnover order because the annuity funds are exempt, as a matter of law, under Article 21.22 of the Texas Insurance Code. In Issue No. Two, he attacks the legal and factual sufficiency of the evidence to support a number of findings pertaining to the court's determination that he fraudulently transferred non-exempt property. In his third issue, he challenges the legal and factual sufficiency of the evidence to support the trial court's findings that he used non-exempt funds to fund the annuity. Although Leibman raises these contentions as separate issues on appeal, we conclude that they must be reviewed together under an analysis which incorporates the appropriate abuse of discretion and evidentiary sufficiency standards of review.

### Standards of Review

■ In a bench trial, factual and legal sufficiency challenges to the trial court's findings of fact are reviewable under the same standards that are applied in reviewing evidence supporting a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Schwartz v. Pinnacle Communications*, 944 S.W.2d 427, 431 (Tex.App.—Houston [14th Dist.] 1997, no writ). In considering a "no evidence," or legal insufficiency point, we consider only the evidence that tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Tri–State Wholesale Associated Grocers, Inc. v. Barrera*, 917 S.W.2d 391, 394 (Tex.App.—El Paso 1996, writ dism'd by agr.). If more than a scintilla of evidence exists to support the questioned finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 25 (Tex.App.—El Paso 1994, writ denied).

The test for factual insufficiency is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. It is for the jury to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Carrasco v. Goatcher*, 623 S.W.2d 769, 772 (Tex. App.—El Paso 1981, no writ). The jury's finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. *Id.* The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *See, e.g., Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30–31 (Tex.1994); *Beall v. Ditmore*, 867 S.W.2d 791, 795–96 (Tex.App.—El Paso 1993, writ denied). Here, of course, the factfinder was the trial court and not a jury. Nevertheless, we cannot substitute our judgment for that of the factfinder even if we find a fact contrary to that found by the trial court, provided the finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained.

■ We review a turnover order under an abuse of discretion standard. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991). In conducting this review, we engage in a two-pronged analysis: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) Did the trial court err in its application of discretion? *Lindsey v. Lindsey*, 965 S.W.2d 589, 591 (Tex.App.—El Paso 1998, no pet.). The traditional sufficiency of the evidence review, articulated above, comes into play

when considering the first question. *Id.* at 591.. We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision, or whether it is arbitrary and unreasonable. *Id.*The question is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Lindsey,* 965 S.W.2d at 591. The mere fact that a trial judge may decide a matter within her discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Company v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965); *Lindsey,* 965 S.W.2d at 592.

### Turnover Statute and Statutory Exemption

Grand filed her application for turnover relief pursuant to Section 31.002(a) of the Texas Civil Practice and Remedies Code, which provides:

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

(1) cannot readily be attached or levied on by ordinary legal process; and

(2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

Tex.Civ.Prac. & Rem.Code Ann. § 31.002(a)(Vernon 1997). The actions which a trial court may take in exercising its discretion are set forth in Section 31.002(b). The court:

• may order the judgment debtor to turn over non-exempt property to a designated sheriff or constable for satisfaction of the judgment; or

• may otherwise apply the property to the satisfaction of the judgment; or

• may appoint a receiver with the authority to take possession of the non-exempt property toward satisfaction of the judgment.

Tex.Civ.Prac. & Rem.Code Ann. § 31.002(b). A court may not, however, enter or enforce an order that requires the turnover of the proceeds of, or the disbursement of, property exempt under any statute. Tex.Civ.Prac. & Rem.Code Ann. § 31.002(f).

Leibman maintains that the cash surrender value of the annuity is exempt by virtue of Article 21.22, § 1 of the Texas Insurance Code. This article provides, in relevant part, that policy proceeds and cash values to be paid or rendered to the insured or any beneficiary under any annuity contract issued by a life, health, or accident insurance company is fully exempt from execution, attachment, garnishment, or other process, and further, is fully. exempt from being seized, taken, appropriated, or applied by any legal or equitable process or operation of law to pay any debt or liability of the insured or of any beneficiary, either before or after said money or benefits is or are paid or rendered. Tex. Ins.Code Ann. art. 21.22, §§ 1, 6 (Vernon Supp.1998). However, the exemptions found in Section 1 are not absolute. Article 21.22, § 3 provides:

The exemptions provided by Section 1 of this article do not apply to:

(1) premium payments made in fraud of creditors subject to the applicable statute of limitations for the recovery of the premium payments....

Tex.Ins.Code Ann. art. 21.22, § 3.

### Intent to Defraud

■ Leibman challenges the trial court's determination that the annuity is not exempt by virtue of Article 21.22, § 3 because the premium payments were made in fraud of Grand. More specifically, he attacks the legal and factual sufficiency of the evidence to support the trial court's finding that Leibman made the premium payments with intent to defraud Grand.[4] Generally, intent to defraud

4. Leibman also attacks the trial court's finding

that these same transactions constituted a fraud-

is a fact question uniquely within the realm of the trier of fact and depends upon the credibility of the witnesses and the weight to be given to their testimony. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). Since intent to defraud is generally not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Spoljaric*, 708 S.W.2d at 435. We begin with a review of the evidence presented at trial.

During the pendency of the North Carolina action, Leibman moved to Texas. He did not appear for trial in the proceedings which culminated in the entry of the judgments in question. He never paid any portion of the equitable distribution judgment or the alimony arrearage judgment, nor did he make any of the permanent alimony payments ordered by the court. After the North Carolina judgments were entered, Leibman purchased a home in Harris County, Texas, referred to in the record as the Bridgestone property. He resided in that home until July of 1995 when he purchased a second home with a down payment of approximately $9,000. Leibman moved into the second home, which he claimed as his homestead, and the Bridgestone property became rental property.

On November 2, 1995, Grand served Leibman with an original petition to register and enforce the foreign judgments, which he answered on November 21, 1995. We turn now to a chronology of the various financial transactions:

- February 14, 1996—Leibman sold his 33–foot sailboat for $17,500, which was $9,000 less than the purchase price, and, according to Leibman, reflected half of its value.

- February 15, 1996—Leibman sold an automobile for $6,000 to the Lincoln Mercury dealer when he purchased a new 1996 Mercury Sable.

- April 30, 1996—The trial court conducted the hearing on Grand's petition to register the judgments. Leibman was in the courtroom when the trial judge pronounced from the bench that she was granting the petition.

- April 30, 1996—Leibman closed on the sale of the Bridgestone property and received proceeds in the amount of $5,827.58. The sales price was $8,000 less than the purchase price four years earlier.

- May 30, 1996—The written order confirming registration of the foreign judgments was signed by the trial court.

- June 28, 1996—Leibman entered into a non-qualified deferred variable annuity contract with Fidelity for an initial investment of $23,000, funded with a cashier's check from Charter Bank in Houston.

- July 3, 1996—Leibman borrowed $15,000 from his 401K plan which he deposited into his current wife's checking account at Charter Bank.

- July 29, 1996—Leibman contributed an additional $12,000 to his annuity account, funded with another cashier's check from Charter Bank.

With the exception of the contract for sale of the sailboat, the closing statement for the sale of the Bridgestone property, and the promissory note, Leibman destroyed[5] all records of these transactions, including his bank records for the relevant time period. Indeed, Leibman testified that he had no intention of satisfying the judgments from the money realized from these transactions:

Q: You didn't intend to pay any of the money from the boat sale to Yana Grand, did you?

A: I did not.

Q: And you didn't intend to pay any money from the rental house to Yana Grand?

A: I did not.

ulent conveyance under a provision of the Uniform Fraudulent Transfer Act, namely, Tex.Bus. & Comm.Code Ann. § 24.005 (Vernon Supp.1998). In light of our conclusion that legally and factually sufficient evidence supports the non-application of the exemption provided by Article 21.22, § 1, it is unnecessary to address this contention.

5. Leibman challenged this characterization of his actions, claiming "I did not destroy anything.... I threw them out."

Q: And you didn't intend to pay any of the rental money from the house itself to Yana Grand, did you?

A: I did not.

Q: And you didn't intend to pay any money from the boat lease to Yana Grand, did you?

A: I did not.

Q: And you didn't intend to pay any of the money from the 401K loan to Yana Grand, did you?

A: I did not.

Q: You didn't intend to pay any part of the bank account money to Yana Grand?

A: To Yana Grand?

Q: You didn't intend to use any of the money that you had in that Charter Bank account to pay over to Yana Grand?

A: I did not.

Q: You didn't have any intent to pay Yana Grand any money for those judgments, did you?

A: I did not.

Q: And you didn't have any intent to pay her any of the permanent alimony that was due and payable every month for the rest of her life, did you?

A: I did not.

Leibman urges that we should consider his subsequent explanation of this testimony. While we will consider it in reviewing factual sufficiency, it falls within the category of contrary evidence that we must disregard in conducting a legal sufficiency review of the challenged findings.

The evidence demonstrates that within months of Grand's filing of the petition to register the judgments, Leibman sold a sailboat and real property for $17,000 less than he had paid for them, sold a vehicle for $6,000, invested $35,000 of non-exempt funds[6] in an exempt annuity, and destroyed most of the records pertaining to these transactions. As a result, Leibman had no non-exempt assets which could be seized or applied to the judgments.[7] When this evidence and the favorable inferences which may be drawn therefrom are considered together with Leibman's stated intention not to pay the judgments, the evidence is legally sufficient to support the finding that the premium payments were made with intent to defraud Grand.

Turning to factual sufficiency of the evidence, we have reviewed all of the evidence surrounding Leibman's financial situation, including the many transactions he entered into after he was served with the petition to register the judgments and the testimony of his intent. We also have considered his explanations for the various transactions, which we will now relate.

Leibman purchased his sailboat in 1991 for $26,500 and an advertisement for the vessel indicated that he spent another $8,000 dollars upgrading it. Leibman explained that he decided to sell the sailboat in 1994 because his new wife had no interest in sailing, and although he leased the sailboat, his annual expenses exceeded the rental income by $4,000. He initially listed it for sale in April of 1994 for $34,500. When it did not sell, he listed it with another broker in June of 1995 for $29,900. He finally sold the sailboat in February of 1996 for $17,500, and Leibman considered himself "lucky" to get that price for it because the market had fallen drastically. Although Leibman maintained that he realized only $16,000 from the sale after paying the broker's commission, he had no records to establish that he actually paid any commission at all.

Leibman purchased the Bridgestone property in 1992 for $74,500, and in March of 1995, he listed it for sale at an asking price of $79,900. He sold the property on April 30,

---

**6.** Later in this opinion, we reject Leibman's contention that the evidence is legally and factually insufficient to support the trial court's determination that the assets used to purchase the annuity are non-exempt.

**7.** At the hearings held in early 1997, Leibman testified that he and his wife had separate bank accounts. He had only $25 in his wallet and $150 in a Texas Commerce Bank account. He had closed the Charter Bank account and had no other bank accounts. At the time, Leibman owned a 1996 Mercury Sable which had a lien of $14,000 against it.

1996 for $66,500, of which he realized $5,827.58. Leibman denied knowing that the Bridgestone property and the sailboat were non-exempt or that they could be seized and sold in satisfaction of the judgment. Despite his presence at the April 30, 1996 hearing, he claimed he did not understand whether the court had ruled for or against him. Finally, Leibman, who was fifty-nine years old at the time of the relevant hearings, stated that his sole intent in selling the assets and investing in the annuity was to fund his retirement and support his new family, and that he would pay the judgments if he had the money.

When all of the evidence is considered, and keeping in mind that the trial court had the opportunity to hear Leibman's testimony, observe his demeanor, and evaluate his credibility,[8] we conclude that the court's finding that Leibman made the premium payments with intent to defraud Grand is not contrary to the great weight and preponderance of the evidence. Accordingly, we find that the evidence is factually sufficient.

### *Non–Exempt Funds*

■ Leibman challenges the trial court's finding that the premium payments were made with non-exempt funds.[9] As a general rule, the party asserting an exemption bears the burden of establishing entitlement to the exemption.[10] We will first consider the legal sufficiency of the evidence to establish the relevant findings.

The Fidelity annuity was purchased with two cashier's checks drawn on Charter Bank in Houston. The first check was in the amount of $23,000; the second was in the amount of $12,000. Leibman told different stories concerning the origin of the initial $23,000 investment in the annuity. At the December 23, 1996 hearing, he testified that all of the proceeds from the sale of the Bridgestone property were "spent ... to cover all my debts." After testifying that the source of the $12,000 investment was a loan [11] from his 401K plan, Leibman testified:

Q: Where did the other 20 or $22,000 come from?

A: I been collecting all this money over five years—

Q: Okay.

A: —in order to open an annuity account, but I wasn't able to open that account properly until I got a chance to do that.

His testimony on April 7, 1997, was substantially different:

Q: Mr. Leibman. I believe it was your testimony that you took the boat pro-

---

8. As we will detail with regard to the sufficiency of the evidence to support the finding that non-exempt assets were used to purchase the annuity, Leibman's testimony was at best inconsistent and contradictory.

9. More specifically, the trial court found that: (1) the proceeds from the sale of the sailboat and the Bridgestone property and the loan from the 401K plan were non-exempt funds; (2) the rentals received by Leibman for the sailboat and the Bridgestone property were non-exempt funds; (3) most, if not all, of the proceeds from the sale of the sailboat and the Bridgestone property, as well as the loan proceeds, were placed in Leibman's Charter Bank account; and (4) Leibman placed non-exempt funds into the annuity account. Based upon these findings, the trial court concluded that Grand and the receiver met their burden of proof in tracing non-exempt personal funds into the annuity account. Leibman does not challenge the third finding.

10. *See Roosth v. Roosth*, 889 S.W.2d 445, 459 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Rucker v. Rucker*, 810 S.W.2d 793, 795–96

(Tex.App.—Houston [14th Dist.] 1991, writ denied). The amount of proof required to satisfy this burden will vary from case to case. In *Roosth*, for example, the court found that the appellant sufficiently established entitlement to the exemption in Tex.Prop.Code Ann. § 42.002(12)(Vernon Supp.1998) where the turnover order reflected on its face that the beneficiary of the life insurance policies was a testamentary trust for the benefit of the children. *Roosth*, 889 S.W.2d at 459–60. In *Rucker*, the appellant claimed that the monthly disability payments from his pension fund were exempt under Tex Prop.Code Ann. § 42.0021, which exempts disbursement of retirement plans and pension funds from turnover orders. *Rucker*, 810 S.W.2d at 795–96. The court of appeals found that the appellant failed to prove his entitlement to the claimed exemption because he did not establish that his retirement plan qualified under applicable provisions of the Internal Revenue Code as required by Section 42.0021. *Id.*

11. The loan was in the amount of $15,000. Of this, Leibman used $12,000 to purchase the annuity and the remaining $3,000 to pay bills.

ceeds of approximately $8,900;[12] and you took proceeds from your vehicle of approximately $6,000; you took $3,000 worth of cash; and you took the proceeds from the sale of the [Bridgestone] house, which, basically, came up to the 23,000–dollar investment that you made in the annuity in July of 1996; is that right?

A: That's correct.

### Sale Proceeds

Leibman does not argue on appeal that the sales proceeds of the Bridgestone property are exempt. Instead, his focus is on the sailboat and the vehicle he sold in February of 1996. In urging that the sailboat and its sale proceeds are exempt, Leibman relies on Section 42.002(a)(4) of the Texas Property Code, which provides:

> (a) The following personal property is exempt under Section 42.001(a):
>
> . . .
>
> (4) tools, equipment, books, and apparatus, including boats and motor vehicles used in a trade or profession. . . .

TEX.PROP.CODE ANN. § 42.002(a)(4).

### The Sailboat

■ In order for the sailboat to fall within this section, there must be evidence that it fairly belonged to or was usable in the debtor's trade and that it was used with sufficient regularity to indicate actual use by the debtor. *In re Erwin,* 199 B.R. 628, 630 (Bkrtcy. S.D.Tex.1996). Leibman asserts that the boat is exempt under this section because he gave his co-worker, Robert Galloway, sailing lessons. On the basis of this evidence, Leibman characterized himself as a sailing instructor. He admitted, however, that Galloway did not pay him for the lessons but instead helped him set up a computer. The evidence further shows that Galloway ceased living on the sailboat many months before Leibman sold it. There is no evidence that Leibman had ever used the sailboat for the purpose of giving sailing lessons to anyone other than Galloway, nor that he was acting as a sailing instructor at the time he sold the boat. In fact, the evidence is to the contrary given Leibman's other testimony that he decided to sell the boat because he was too exhausted on the weekends to sail. Stated simply, the trial court could have found the evidence did not support application of this exemption.

Leibman also urges application of Section 42.002(a)(4) because he used the boat to help him maintain his employment as an electrical engineer by entertaining potential clients on board on three or four occasions. We find no authority to support application of this exemption, nor does Leibman reference any. Further, we fail to perceive in general how a sailboat could be legitimately used in the trade or profession of an electrical engineer. The trial court did not err in failing to apply this exemption to the sailboat or to the proceeds from its sale. Accordingly, we find that the evidence is both legally and factually sufficient to support the trial court's finding that the proceeds from the sale of the sailboat and the Bridgestone property are nonexempt property.

### The Automobile

■ Because the undisputed evidence shows that at the time of the sale, Leibman owned two automobiles, one driven by him and one driven by his wife, Leibman carried his burden of showing that this vehicle is exempt under TEX.PROP.CODE ANN. § 42.002(a)(9)(providing an exemption for a four-wheeled motor vehicle for each member of a family who holds a driver's license). The question we must answer, then, is whether the proceeds from its sale are also exempt. We have found no authority directly addressing this issue. With the exception of "current wages for personal services"[13] and a

---

**12.** Leibman claimed to have made the following expenditures from the $17,500 in boat proceeds: $1,500 in sales commission; $2,046 to the Internal Revenue Service for his 1995 federal income taxes; $2,572.49 to repay a loan from his 401K plan; $1,000 for the down payment on a hot tub; and $1,500 for its installation in his home.

**13.** This exemption does not apply to the enforcement of court-ordered child support payments. TEX.PROP.CODE ANN. § 42.001(b)(1).

limited amount of "[u]npaid commissions for personal services," Sections 42.001 and 42.002 do not provide an exemption for currency, checks, or negotiable instruments. TEX.PROP.CODE ANN. § 42.001 and § 42.002. Although Leibman does not directly rely on this statute, Section 31.002(f) provides:

> A court may not enter or enforce an order under this section that requires the turnover of the proceeds of, or the disbursement of, property exempt under any statute, including Section 42.0021, Property Code. This subsection does not apply to the enforcement of a child support obligation or a judgment for past due child support.

TEX.CIV.PRAC. & REM.CODE ANN. § 31.002(f).

In 1989, the Legislature added subsection (f) to the turnover statute in response to a line of cases that allowed the turnover of property that had lost its exempt status because a debtor had received it, such as paychecks, retirement checks, and other similar types of assets. *Burns v. Miller, Hiersche, Martens & Hayward, P.C.,* 948 S.W.2d 317, 322–23 (Tex.App.—Dallas 1997, writ denied)(discussing the legislative history of the amendment); *see Schmerbeck v. River Oaks Bank,* 786 S.W.2d 521, 522 (Tex.App.—Texarkana 1990, no writ)(holding that paycheck is not exempt as "current wages" once it has been paid to and received by the judgment debtor); *Cain v. Cain,* 746 S.W.2d 861, 864 (Tex.App.—El Paso 1988, writ denied)(holding that retirement benefits lose their exempt status once they had been paid to and received by the judgment debtor). Stripping the assets of their exempt status because the judgment debtor had received them was viewed as thwarting the purpose of the exemption. *See Burns,* 948 S.W.2d at 323.

In our view, an entirely different situation is presented where a judgment debtor, as in this case, voluntarily liquidates exempt personal property, such as an automobile, and holds the funds for several months before investing them in an exempt annuity. A finding that the funds realized from the sale of the vehicle are not exempt, particularly

where the judgment debtor has purchased a replacement vehicle, does not defeat the purpose of the exemption provided by Section 42.002(9). To hold otherwise would permit Leibman to claim an exemption not only for his two automobiles but also for the funds realized from the sale of a third vehicle. This we decline to do.

### Rental Proceeds

The trial court found that in addition to the sales proceeds, Leibman also deposited rental income into the Charter Bank account. Whether this income relates to the $3,000 in cash that Leibman claimed he contributed to the initial $23,000 annuity investment is not altogether clear from the record. However, the record does reflect that in addition to his salary as an electrical engineer, Leibman earned rental income from the sailboat and the Bridgestone property. In 1994, he began leasing the sailboat to his co-worker, Robert Galloway, who lived onboard the vessel for approximately a year and a half. On his 1994 federal income tax return, Leibman claimed rental income from the boat lease in the amount of $2,400; the 1995 tax return reflects $1,000 in rental income. The 1995 return also reveals $5,100 in rental income from the Bridgestone property.[14]

Leibman does not argue on appeal that the $5,100 in rental income he received from the lease of the Bridgestone property is exempt. Since his assertion that the $3,400 in rental income he received from the lease of his sailboat is premised solely on his claim of exemption for that asset—a claim we have already rejected—this argument must likewise fail. Accordingly, we find that the evidence is both legally and factually sufficient to support the trial court's finding that the rental income is non-exempt.

### Loan Proceeds

■ Leibman next argues that the $15,000 he borrowed from his 401K plan is exempt under TEX.PROP.CODE ANN. § 42.0021. This section provides an exemption for the assets

---

14. After deductions for expenses and depreciation, however, the 1995 return reported losses of $1,532 and $394 in connection with the leasing of the sailboat and the Bridgestone property, respectively.

held in, and payments from, qualified retirement plans. It is undisputed that Leibman's employee savings plan is a qualified plan. A copy of the CDI Corporation Employee Savings Plan (the Plan) was admitted into evidence. Article X of the Plan pertains to loans from the Plan and provides that the loan amount is actually debited against the participant's various subaccounts. The record also contains a copy of the promissory note executed by Leibman. Attached to the promissory note is a document entitled "CDI Corporation Employees Savings Plan," which refers to the $15,000 paid to Leibman as a "distribution" from the Plan. If this distribution is construed as a payment from the Plan within the meaning of Section 42.0021, it is exempt. Even if this distribution is not a "payment," it is certainly a disbursement for purposes of Section 31.002(f). Accordingly, we find the evidence is legally insufficient to support the trial court's finding that the loan proceeds are non-exempt.

### Legal Sufficiency Analysis

■ Because we have found that the loan proceeds from the 401K plan are exempt, we exclude from our legal sufficiency analysis the $12,000 investment from that source. Nevertheless, rejecting all evidence and inferences to the contrary, the record supports the conclusion that Leibman received non-exempt funds in the amount of $17,500 from the boat sale, $6,000 from the sale of the vehicle, $5,827.58 from the sale of the Bridgestone property, and $8,500 in rental income for a total of $37,827.58. This calculation does not include the $3,000 in cash that Leibman claimed to have invested or the $20,000 that he admitted saving over a five-year period for the purpose of investing in an annuity. We conclude the evidence adequately supports the finding that the $35,000 investment in the annuity was made with non-exempt funds. As a result, any growth in the contract value is likewise non-exempt.

### Factual Sufficiency Analysis

In considering the factual sufficiency of the evidence, we have considered all of the evidence, including Leibman's oftentimes contradictory testimony regarding the source of funds used to invest in the annuity and his expenditure of funds for particular purposes. The trial court was not bound to accept all or any certain part of Leibman's testimony, particularly since he had destroyed the records which might have supported or contradicted his version of events. If we accept as true Leibman's testimony that he used only $8,900 of the boat proceeds, $6,000 in car proceeds, $3,000 in cash, and $5,827.58 in Bridgestone proceeds, we must also accept as true his unrecanted testimony that he had saved $20,000 over a five-year period to open an annuity account. Even assuming that the federal income tax returns accurately reflect that his expenses for the sailboat and the Bridgestone property exceeded his rental income, the record supports a finding that Leibman had non-exempt funds in the amount of $43,727.58 available at the time he purchased the annuity. These calculations again exclude the proceeds of the loan from the 401K plan. We conclude that the evidence is factually sufficient to establish that Leibman used non-exempt funds to make the $35,000 investment in the annuity. We further conclude that the trial court's decision to issue the turnover order was neither arbitrary nor unreasonable, and accordingly, we find no abuse of discretion. Issue Nos. One, Two, and Three are overruled.

### DENIAL OF JURY TRIAL

■ In his fourth appellate issue, Leibman contends that the turnover order is void because the trial court denied his request for a jury trial. The turnover statute aids judgment creditors in reaching property of the judgment debtor that cannot be readily attached and is not exempt. TEX.CIV.PRAC. & REM.CODE ANN. § 31.002(a). The trial court has jurisdiction to determine if property of the judgment debtor is not exempt. *Pace v. McEwen*, 617 S.W.2d 816, 819 (Tex.Civ. App.—Houston [14th Dist.] 1981, no writ). Provided he makes a timely request and payment of the jury fee in accordance with the requirements of Rule 216 of the Texas Rules of Civil Procedure, the judgment debtor is entitled to a jury trial on fact issues. *Steenland v. Texas Commerce Bank National Association*, 648 S.W.2d 387, 391 (Tex.

App.—Tyler 1983, writ ref'd n.r.e.). Rule 216 provides:

    **a. Request.** No jury trial shall be had in any civil suit, unless a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance.

    **b. Jury Fee.** Unless otherwise provided by law, a fee of ten dollars if in the district court and five dollars if in the county court must be deposited with the clerk of the court within the time for making a written request for a jury trial. The clerk shall promptly enter a notation of the payment of such fee upon the court's docket sheet.

TEX.R.CIV.P. 216.

When Leibman filed his written request for a jury and paid the jury fee on March 5, 1997, the trial was set for March 18, 1997.[15] For reasons not apparent in the record, the trial did not actually commence until March 27.[16] Leibman claims that the request, although filed only twenty-two days before trial, was nevertheless filed within a reasonable time before the trial date. He argues that the contested fact issue prompting his jury request did not arise until Grand filed the supplemental application for turnover on March 7, in which she specifically alleged that the annuity was not exempt under the Property Code, the Business and Commerce Code, or the Insurance Code. We disagree.

This is not a case in which Leibman filed his jury request immediately upon discovering a contested fact issue. To the contrary, the record reflects that Leibman did not make his jury request until March 5, 1997, even though Grand had consistently maintained since December 23, 1996 that the funds in the annuity were subject to turnover because Leibman had fraudulently trans-

ferred non-exempt property in an effort to avoid the judgments. In making this argument at the December 23 hearing, she pointedly relied on Section 42.004 of the Texas Property Code, and it was in response to these allegations that the trial court abruptly concluded the hearing and appointed a receiver. Thus, it was apparent to all concerned that the exempt status of the annuity and Leibman's intent in transferring funds into the annuity were contested fact issues long before Leibman requested a jury trial. Because Leibman failed to comply with Rule 216, the trial court did not abuse its discretion in denying the request for a jury on this issue. *See Huddle v. Huddle,* 696 S.W.2d 895 (Tex.1985)(on motion for rehearing); *Martin v. Black,* 909 S.W.2d 192, 197 (Tex. App.—Houston [14th Dist.] 1995, writ denied). Issue No. Four is overruled.

### RECEIVER'S AUTHORITY

    ■ In his final issue, Leibman seeks to have us advise the parties that the general language in the order appointing the receiver is "void for vagueness" and that the receiver's authority is derived solely from the April 14, 1997 turnover order. On June 17, 1997, the receiver, at least partially in reliance on the order appointing her, filed an "Emergency Motion for Temporary Restraining Order." By this motion, she sought to have Leibman's appellate counsel and trial counsel turn over all funds held by them and paid to them in the future in which Leibman may have any interest. The motion was resolved by an agreement of the parties. Consequently, there is no live dispute between the parties. Leibman does not complain about any other action taken by the receiver. Even so, he expresses concern that the receiver may exceed her authority in the future. Under these circumstances, any opin-

---

**15.** On February 28, 1997, in response to a request by Leibman's counsel, the court set the case for an evidentiary hearing on the issue of the exempt status of the annuity. The record is unclear as to the date of the setting, but it was certainly no later than March 18. Grand alleges in her brief that the hearing was first set for March 7, but that when the parties appeared on that date, the court re-set it to March 17. Leibman alleged in his motion for continuance filed on March 14 that the case was set for trial on March 18. The court's docket sheet is stamped

with the date March 17, 1997 but it contains no entry on that date. For purposes of reviewing Leibman's contention, we will accept as true the assertion made in his sworn motion for continuance that the case was set for trial on March 18.

**16.** After hearing arguments of counsel, the trial court recessed the proceedings until April 7 to avoid hearing the evidence in a piecemeal fashion.

ion we could give would be, by its very nature, an advisory opinion. A court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe or to decide a case on speculative, hypothetical, or contingent fact situations. *Camarena v. Texas Employment Commission,* 754 S.W.2d 149, 151 (Tex.1988); *Hanna v. Godwin,* 876 S.W.2d 454, 457 (Tex.App.—El Paso 1994, no writ). Issue No. Five is overruled.

Having overruled all of Leibman's points of error, we affirm the turnover order.