ABRAXAS PETROLEUM CORPORA-TION, and Abraxas Production Corporation, Appellants,

v.

John H. HORNBURG and Gwendolyn Hornburg Hauter, and Marian C. Guiberson, Appellees.

No. 08–98–00286–CV.

Court of Appeals of Texas, El Paso.

March 16, 2000.

Margaret Blair Sullivan, Cox & Smith Inc., San Antonio, for Appellants.

Brad Miller, Woerndle, Patterson, Strain & Miller, LLP, Jimmie D. Oglesby, Lynch, Chappell, Allday & Alsup, Midland, Samuel A. Guiberson, Guiberson Law Office, Frank Birchak, Houston, for Appellees.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Abraxas Petroleum Corporation (Abraxas) appeals from judgment entered in favor of Appellees, John H. Hornburg (Hornburg), Gwendolyn Hornburg Hauter (Hauter), and Marian C. Guiberson (Guiberson). We delete the award of exemplary damages and affirm the judgment as modified.

### FACTUAL SUMMARY

The Cleo Smith lease, located in Stonewall County, and a Joint Operating Agreement (JOA) dated August 1, 1984 are at the heart of this dispute. The Cleo Smith

lease had been in continuous production since 1952 and by all accounts had been prolific, having produced 1.6 million barrels of oil by 1992. The lease had four producing wells and its own saltwater disposal well. The parties to the JOA are:

- Pearson–Sibert Oil Company (55.357120 percent working interest);

- Charles H. Hornburg, Jr. (33.333330 percent working interest);

- Marion C. Guiberson (8.333350 percent working interest);

- Amcan Oil Producers (1.488100 percent working interest); and

- Robert D. Fitting (1.488100 percent working interest).[1] Guiberson obtained her one-twelfth interest in the lease sometime in the 1950s. Similarly, Charles Hornburg, Jr. had owned his one-third working interest in the lease since 1952 when it began production. Following Charles Hornburg, Jr.'s death in 1990, Hornburg and Hauter inherited equal shares of that one-third working interest in the lease. From 1952 until the fall of 1992, Pearson–Sibert, with active participation by Fitting, operated the Cleo Smith lease to the apparent satisfaction of all parties.

Despite having been in production for over four decades, the lease was still producing over 1,000 barrels of oil per month when Abraxas purchased Pearson–Sibert's interest and took over operations of the lease on September 1, 1992 pursuant to an assignment of the JOA. Within months, lease operating expenses escalated and oil production dwindled due to increased downtime for the four producing wells. Upset at this turn of events, Hornburg, on behalf of himself, Hauter, and Guiberson, contacted Abraxas in September 1993 regarding purchase of their interests by Abraxas. When he received no response after several weeks, Hornburg called Abraxas and spoke with its president, Robert L.G. Watson. Watson told Hornburg that he would get back to him within a week with an offer to purchase their interests. At about this same time, Hornburg received a joint interest billing statement from Abraxas for work performed during October of 1993. The expenses for that month totaled $43,450.88 and Hornburg's and Hauter's share of the expenses came to $7,278.33 each. Neither Hornburg nor Hauter paid this bill. When Watson did not follow through on his promise, Hornburg wrote Watson a second letter, dated November 23, 1993, inquiring not only about a possible purchase of their interests, but also requesting a copy of the JOA and an explanation of why expenses had risen so drastically while revenues had decreased. Shortly after Hornburg mailed this letter, Abraxas wrote the working interest owners and informed them that all production had ceased on the four producing wells because the number one well had parted rods, the numbers three and four wells had holes in the tubing, and number two had holes in the casing. Abraxas included in the AFE letter[2] a description of proposed workover procedures to restore the wells to production together with a cost estimate for each well. Although none of the jobs for the individual wells exceeded $30,000, the estimated costs to restore production for all four wells totaled $44,250. The letter warned that the number two well would require plugging for abandonment if the casing repair were not performed. If the working interest owners participated in the project, they would be required to pay their proportionate share of the expenses. On the other hand, if they declined to consent, their income from the lease would be paid over to Abraxas until they had paid 300 percent of their proportionate share of the proposed workover operations. Abraxas informed the working interest owners that, pursuant

1. Although Fitting owned his 1.488100 percent individually, he was also Vice President of Pearson–Sibert.

2. The letter is known as an Authorization for Expense letter.

to the JOA, they had thirty days in which to make their election.

A few days later, Hornburg received a letter from Stephen T. Wendel, vice president of land and marketing at Abraxas, dated December 2, 1993. Wendel wrote the letter in response to Hornburg's letter of November 23, 1993. In addition to providing Hornburg with a copy of the JOA as requested, Wendel informed him that circumstances had changed greatly since Abraxas had assumed operation of the lease in October 1992. He stated that a number of casing leaks on the wells had been discovered and that significant sums of money had been expended by Abraxas to maintain or restore production.[3] While reminding Hornburg of the AFE letter and the proposed workover operations, Wendel wrote that it was difficult to project the future performance of the lease since a risk existed that the casing leaks could not be repaired. Consequently, Wendel proposed that it assume Hornburg's interest in the property effective November 1, 1993 in order to eliminate his future risks and obligations. Stunned by the proposal, Hornburg directed no response to Abraxas but instead contacted Fitting, who had served as an advisor to him and his family for many years. Fitting subsequently wrote to Abraxas on behalf of himself and the other working interest owners and challenged not only its status as operator under the JOA, since it had never been formally selected as operator following its purchase of Pearson–Sibert's interest, but also its authority to send the AFE letter since none of the proposed single projects exceeded $30,000. Abraxas disregarded these complaints.

When none of the working interest owners elected within the thirty-day window to proceed with the workover operations, Abraxas deemed their status to be "nonconsent" under the JOA as of December 1, 1993 and it began appropriating their future "runs," that is, the income from the sale of oil produced on the lease. Of the proposed workover operations, Abraxas actually performed only one small project in December 1993 at a cost of approximately $7,500, but it did not notify any of the working interest owners that it had decided not to complete the proposed operations. During the first seven months of 1994, only the number four well remained in production. In the latter portion of the year, the number three and four wells produced sporadically but after the disposal well went down in September with a hole in the tubing,[4] Abraxas made the decision to shut down the lease and produce only one barrel from one well per day each month in order to hold the lease. Consequently, the lease was reduced from a 1,000–barrel–per–month producer when Abraxas obtained the lease to producing only thirty barrels or less per month.

On September 7, 1994, Abraxas, through counsel, made demand on Hornburg for past due operating expenses in the sum of $8,727.69. Hornburg disputed the amount of the bill and obtained counsel. Hornburg and Hauter filed suit alleging, among other things, negligence, gross negligence, willful misconduct, breach of contract, and waste. Abraxas counterclaimed against both Hauter and Hornburg with a suit on sworn account, seeking to collect the lease operating expenses which had not been paid. The counterclaim also alleged a breach of contract action and sought attorney's fees. Abraxas later amended its counterclaim to request a declaratory judgment and attorney's fees pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (Vernon 1997), and by means of a third-party petition, it subsequently included Guiberson and the other working interest owners as third-party defendants to the declaratory judgment action. In response, Guiberson counterclaimed, asserting tortious interference with a contract, conversion, negligence and gross negligence,

---

3. Contrary to Wendel's representation, only the number two well had a casing leak.

4. Abraxas never repaired the disposal well.

waste, and breach of the operating agreement.

At trial, the court determined that Abraxas had never been formally selected as operator pursuant to the provisions of the JOA. The court submitted to the jury issues pertaining to whether Abraxas had committed waste, whether it complied with the JOA in sending the AFE letter, and whether it had substantially performed the work it had proposed. The jury found that Abraxas:

- was grossly negligent in committing waste, but did not engage in willful misconduct;
- breached the JOA by sending the AFE letter and by failing to perform all or substantially all of the work proposed under the AFE letter; and
- engaged in willful misconduct or gross negligence in failing to perform the work proposed under the AFE letter.

The jury further found that Abraxas' conduct proximately caused damages to Appellees, and that Abraxas was not entitled to an offset for reasonable and necessary expenditures on the Cleo Smith lease. In a bifurcated proceeding, the jury also assessed an award of exemplary damages in favor of Appellees. Based upon the jury's verdict and the partial remittiturs of the Appellees, the trial court entered judgment in favor of Hornburg and Hauter for actual damages in the amount of $65,740 each, and in favor of Guiberson in the amount of $32,870. Exemplary damages were awarded in the sums of $262,960 for

Hornburg, $262,960 for Hauter, and $200,000 for Guiberson. The court also entered judgment that Abraxas take nothing on its counterclaims. Finally, the judgment included an award of attorneys' fees for each Appellee.

## ABRAXAS' STATUS AS OPERATOR

 In its first issue for review, Abraxas complains of the trial court's determination that Abraxas had never been formally selected as operator pursuant to the provisions of the JOA.[5] Abraxas argues that despite its failure to be formally selected, it was the operator of the Cleo Smith lease by virtue of assignment from Pearson–Sibert. Abraxas also maintains that its formal selection is an unnecessary technicality since it is a foregone conclusion that it would have been selected. Finally, it asserts that Appellees have waived their right under the JOA to protest that Abraxas was not formally selected as operator. We need not address the first two arguments in the context of this issue because Abraxas has established, as a matter of law, that Appellees waived the JOA's requirement that the operator be formally selected.[6]

### *Waiver of Operator's Formal Selection*

 Any contractual right can be waived. *Purvis Oil Corp. v. Hillin*, 890 S.W.2d 931, 937 (Tex.App.—El Paso 1994, no writ); *Transwestern Pipeline Co. v. Horizon Oil & Gas Co.*, 809 S.W.2d 589,

---

**5.** Although Abraxas has raised other issues which would require us to reverse and render if they are sustained, we address this issue first because it affects our analysis of the other issues.

**6.** Appellees vigorously argue that Abraxas failed to preserve error because it did not submit a question on the affirmative defense of waiver as required by TEX.R.CIV.P. 278. According to Appellees, Abraxas' proposed question asking whether it had been elected operator and related instructions on the defenses of estoppel, waiver, and modification are insufficient to preserve error. We need not reach that issue because Abraxas argues

on appeal, and we agree, that it conclusively established this defense as a matter of law. Under these circumstances, it is not required to preserve the issue by submitting or requesting a jury question on waiver. TEX.R.CIV.P. 279; *see Texas Prudential Ins. Co. v. Dillard*, 158 Tex. 15, 307 S.W.2d 242, 249 (1957). An issue is conclusively established when the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. *Triton Oil and Gas Corporation v. Marine Contractors and Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982); *Brown v. Welltech, Inc.*, 769 S.W.2d 637, 639 (Tex. App.—El Paso 1989, writ denied).

592 (Tex.App.—Dallas 1991, writ dism'd w.o.j.). A waiver is an intentional release, relinquishment, or surrender of a known right. *Massachusetts Bonding and Ins. Co. v. Orkin Exterm. Co.*, 416 S.W.2d 396, 401 (Tex.1967); *Purvis Oil*, 890 S.W.2d at 937. In order to establish a waiver of rights under a contract, there must be proof of an intent to relinquish a known right. *Huffington v. Upchurch*, 532 S.W.2d 576, 580 (Tex.1976); *Purvis Oil*, 890 S.W.2d at 937.

Article V of the JOA designated Pearson–Sibert as operator and described its responsibilities. This same article contains two provisions relating to the resignation or removal of the operator and the selection of a successor. Articles V.B.1 and V.B.2 provide as follows:

1. *Resignation or Removal of Operator:* Operator may resign at any time by giving written notice thereof to Non–Operators. If Operator terminates its legal existence, no longer owns an interest in this Contract Area, or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non–Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership by the affirmative vote of two (2) or more Non–Operators owning a majority interest based on ownership as shown on Exhibit 'A', and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non–Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non–Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. *Selection of Successor Operator:* Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit 'A', and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

■ As found by the trial court, Pearson–Sibert's sale of its interest to Abraxas resulted in its resignation as operator pursuant to Article V.B.1, thereby invoking Article V.B.2's requirement that a successor operator be selected from the parties owning an interest in the contract area. The latter requirement is in the nature of a condition precedent [7], the performance of which can be waived by words or inferred from a party's conduct. *Sun Exploration and Production Co. v. Benton*, 728 S.W.2d 35, 37 (Tex.1987).

It is undisputed that Hornburg, Hauter, and Guiberson knew no later than November 1992, that Abraxas had purchased Pearson–Sibert's interest in the Cleo Smith lease and had assumed operations. Beginning on October 31, 1992, each of them received monthly operating statements from Abraxas delineating the prior month's total lease operating expenses and an invoice for their respective share. As they had with Pearson–Sibert, Hornburg,

7. *Purvis Oil*, 890 S.W.2d at 937.

Hauter, and Guiberson paid their proportionate share of the expenses pursuant to these billings. Additionally, Hornburg and Guiberson engaged in written and personal communications with Abraxas regarding their questions and complaints about operations of the lease. In fact, Guiberson personally visited the Abraxas office in San Antonio and discussed the lease operating expenses with two of its officers. On December 17, 1993, Robert D. Fitting wrote a letter to Abraxas on behalf of all of the non-operating interest owners, including himself. While taking issue with the propriety of the AFE letter under the terms of the JOA and demanding that Abraxas return the lease to production or face legal action, the letter pointed out that Abraxas had never been formally selected as operator by the non-operating owners. The letter did not, however, demand that Abraxas take steps to obtain formal selection but instead insisted that Abraxas adhere to the JOA and act as a prudent operator in returning the lease to production. Hornburg, Hauter, and Guiberson did not raise the issue of Abraxas' non-selection again until they filed suit in 1995.

In *Purvis Oil*, we addressed the issue of waiver under the same provisions of a JOA but under different facts. In that case, the original operator, Tiburon, filed a bankruptcy petition and subsequently sold its interest in the wells to Claydesta National Bank (CDNB). Tiburon entered into a suboperating agreement with Hillin to operate the lease. The agreement anticipated that Hillin would be elected operator in the future and the suboperating agreement would terminate. Hillin, Tiburon, and CDNB entered into another agreement whereby Hillin would acquire Tiburon's and CDNB's interest in certain properties included in the JOAs. The non-operating interest owners ratified the suboperating agreement and elected Hillin as operator even though Hillin had not yet acquired an interest in the contract area as required by the JOA. The bankruptcy court approved Tiburon's resignation as operator and the assignment of its rights to Hillin. The non-operating interest owners formally selected Hillin, a suboperator, as operator even though it did not yet own an interest in the contract area as required by the JOA. After Hillin had been serving as operator for one year, CDNB withdrew its offer to sell to Hillin those interests it had acquired from Tiburon. Hillin later purchased another interest in the contract area and acted as operator for five years. After Purvis purchased Tiburon's interests held by CDNB, it adopted the position that Hillin had never been properly elected as operator because it did not own an interest in the contract area at the time of its election. Consequently, Purvis polled the non-operating owners and was selected as operator by a majority. When Hillin refused to resign, Purvis brought an action for declaratory judgment, injunctive relief, and interference with business relations. This Court found, as a matter of law, that the non-operating interest owners waived the JOA's ownership requirement not only by voting for or assenting to the selection of Hillin as successor operator but also by accepting the benefits of Hillin's performance while knowing that Hillin, in reliance on its ratification as suboperator and successor operator, had expended time, effort, and expense to operate the properties. *Purvis Oil*, 890 S.W.2d at 937.

Appellees seek to distinguish *Purvis Oil* because Hillin had been formally selected as operator. We recognize that *Purvis Oil* involved a different aspect of Article V.B.2 and that the facts are somewhat different. Nevertheless, the case stands for the proposition that non-operating interest owners can waive requirements of the JOA pertaining to selection of a successor operator by permitting another party to act as operator, despite a failure to qualify as such, and by accepting the benefits of that party's performance. In this case, Hornburg, Hauter, and Guiberson effectively assented to Abraxas as operator and accepted the benefits of Abraxas' performance while knowing that Abraxas, in reliance on its

assignment by Pearson–Sibert, had expended time, effort, and expense to operate the Cleo Smith lease. *See Purvis Oil,* 890 S.W.2d at 937. Therefore, we find that the Appellees waived the JOA's requirement that Abraxas be formally selected as operator. *Id.*

Ordinarily, our next task would be to determine whether there exists harm requiring reversal under TEX.R.APP.P. 44.1(a)("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals."). *See Connell Chevrolet Co., Inc. v. Leak,* 967 S.W.2d 888, 894 (Tex. App.—Austin 1998, no pet.). Abraxas urges that it is harmed because the error detrimentally affected the manner in which the remaining issues were submitted to the jury. First, it claims that because there is no finding of gross negligence or willful misconduct in connection with the AFE issue, or alternatively, the evidence is legally and factually insufficient to sustain the finding, it is not liable under the JOA. Abraxas does not explain and we are unable to perceive how the trial court's error in Issue One resulted in the improper submission of the breach of contract issues. Further, as we will later conclude, the exculpatory clause does not apply to the breach of contract issues, so it is unnecessary for Appellees to establish gross negligence or willful misconduct. Second, Abraxas asserts that the trial court's error permitted Appellees to maintain a waste cause of action which ultimately resulted in the imposition of both actual and exemplary damages. However, we will subsequently sustain a related argument in Issues Two and Three that Appellees are not entitled to maintain an independent waste cause of action, and as a result, delete the exemplary damages award. Consequently, it is unnecessary to

remand this cause for a new trial. Accordingly, Issue One is overruled.

## WASTE

 In Issues Two (Subpart A), and Three (Subpart C), Abraxas contends that Appellees are not entitled to maintain a waste cause of action because Abraxas' liability, if any, arises out of its breach of the JOA. The acts of a party may breach duties in tort or contract or simultaneously in both. *Southwestern Bell Telephone Co. v. DeLanney,* 809 S.W.2d 493, 494–95 (Tex. 1991); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). As this Court noted in *Hill,* every contract, including a JOA, carries the common law duty to perform the agreed tasks with care, skill, reasonable expedience, and faithfulness so that a breach thereof constitutes a tort as well as a breach of contract. *Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 130 (Tex.App.—El Paso 1997, pet. denied), *citing Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 510 (1947). The nature of the injury most often determines which duties are breached. *Southwestern Bell,* 809 S.W.2d at 494; *Jim Walter Homes,* 711 S.W.2d at 618. If the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. *DeWitt County Electric Cooperative, Inc. v. Parks,* 1 S.W.3d 96, 105 (Tex.1999); *Southwestern Bell,* 809 S.W.2d at 494. Conversely, if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. *Id.* In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. *Southwestern Bell,* 809 S.W.2d at 494. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *Southwestern Bell,* 809 S.W.2d at 494–95; *Jim Walter Homes,* 711 S.W.2d at 618. Therefore, in deciding whether a plaintiff may recover in tort, contract, or both, the court

must determine whether the claim is for breach of a duty created solely by contract rather than a duty imposed by law and whether the injury is only the economic loss to the subject of the contract itself. *Southwestern Bell*, 809 S.W.2d at 494–95; *Jim Walter Homes*, 711 S.W.2d at 618. Ordinarily, we must look to the substance of the cause of action and not necessarily the manner in which it was pled. *Jim Walter Homes*, 711 S.W.2d at 618; *Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 559 (Tex.App.—Houston [14th Dist.] 1997, pet. denied).

Waste is injury to the reversionary interest in land caused by the wrongful act of one lawfully in possession. *Lesikar v. Rappeport*, 809 S.W.2d 246, 250 (Tex.App.—Texarkana 1991, no writ). It exists only when the one in possession destroys or permanently damages the land, which causes a loss to the persons who subsequently may be entitled to the land. *R.C. Bowen Estate v. Continental Trailways, Inc.*, 152 Tex. 260, 256 S.W.2d 71, 72 (1953); *Lesikar*, 809 S.W.2d at 250; *Erickson v. Rocco*, 433 S.W.2d 746, 751 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). This cause of action includes unauthorized destruction or severance of minerals on or from the land. *See Oldham v. Keaton*, 597 S.W.2d 938, 942 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.); *Phillips Petroleum Co. v. Mecom*, 375 S.W.2d 335, 340 (Tex.Civ.App.—Austin 1964, no writ); *Gulf Oil Corporation v. Horton*, 143 S.W.2d 132, 134 (Tex.Civ.App.—Amarillo 1940, no writ). Waste also includes injury resulting from a failure to exercise reasonable care in preserving the property. *Erickson*, 433 S.W.2d at 751.[8] Therefore, the duty imposed on one in possession of land to exercise reasonable care so as to not destroy or damage the land is generally imposed by law rather than contract. Here, however, the JOA governs the operator's conduct with respect to production of oil from the land. By virtue of the JOA, Abraxas had a contractual right to produce the oil from the Cleo Smith lease. Although no provision specifically prohibits the operator from committing waste, Article V.A. requires the operator to "conduct all such operations in a good and workmanlike manner." In other words, the operator is governed by the "reasonably prudent operator" standard. *See Johnston v. American Cometra, Inc.*, 837 S.W.2d 711, 716 (Tex.App.—Austin 1992, writ denied). Indeed, Abraxas' liability for waste is premised upon the jury's determination that it did not act as a reasonably prudent operator. Because the duty violated by Abraxas is derived from its responsibilities as operator under the JOA, Appellees are not permitted to maintain a common law waste cause of action. *See DeWitt County Electric Cooperative*, 1 S.W.3d at 105 (where landowners sued power company for cutting down trees in utility right-of-way, landowners could not maintain negligence claim independent of breach of contract claim because easement permitted power company to cut trees in easement; even though landowners could have maintained negligence suit if no agreement had ever existed between the parties, the contract spelled out the parties' respective rights about whether the trees could be cut and therefore, the contract and not common-law negligence governs the dispute). Because the remaining cause of action is for breach of contract, Appellees were not entitled to recover exemplary damages. Subpart A of Issue Two and Subpart C of Issue Three are sustained.[9]

---

8. Consistent with these definitions, the trial court instructed the jury that " '[w]aste' involves any underground or physical waste or loss incident to or resulting from drilling, equipping, locating, spacing or operating a well or wells in a manner that reduces or tends to reduce the total amount of oil or gas from any pool. Waste does not occur if Abraxas acted as a reasonably prudent operator."

9. Given our disposition of this argument, we need not address the remaining subarguments presented in Issue Three.

## GROSS NEGLIGENCE/WILLFUL MISCONDUCT

In Issue Two, Abraxas challenges the legal and factual sufficiency of the evidence to support the jury's finding that it acted with gross negligence or engaged in willful misconduct. The entire focus of this issue is that Appellees are not entitled to exemplary damages.[10] Having already determined that exemplary damages are unavailable because Appellees may not maintain a cause of action for waste, we find this issue moot. Accordingly, Issue Two is overruled.

## BREACH OF CONTRACT

In Issue Four, Abraxas raises several contentions related to the breach of contract claim. The jury found that:

- Abraxas breached the contract by sending the AFE letter to Appellees on November 24, 1993;
- the breach proximately caused damages to Appellees;
- Abraxas failed to perform all or substantially all of the work proposed under the AFE letter; and
- Abraxas' failure to perform all or substantially all of the work proposed under the AFE was the result of willful misconduct or gross negligence.

### Breach of the JOA

In its first subargument, Abraxas asserts that the mere sending of an AFE letter does not breach any obligation in the JOA because an AFE is nothing more than an estimate of proposed expenditures. Additionally, Abraxas claims that the operations it proposed in the AFE letter constituted "reworking" of the wells within the meaning of Article VI.B.1 so that it properly invoked the consent/non-consent provisions of the JOA, and consequently, there is no breach of the agreement by sending the AFE. Finally, Abraxas argues

that the evidence is legally and factually insufficient to support the jury's finding that it breached the JOA by sending the AFE letter.

Analysis of these contentions requires a discussion of several provisions of the JOA. Abraxas sent the AFE letter pursuant to Article VI.B.1, which permits any party to propose drilling, reworking, deepening, or plugging back a well jointly owned by all the parties and not then producing in paying quantities. The proposing party must send the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation, and the estimated cost of the operation. The parties receiving the notice have thirty days in which to notify the proposing party whether they elect to participate in the cost of the proposed operation. Failure to timely reply constitutes an election to not participate in the cost of the proposed operation. The proposing party, at its election, may withdraw the proposal if there is insufficient participation and shall promptly notify all parties of that decision. By virtue of Article V.B.2, if any well drilled, reworked, deepened, or plugged back under the provisions of this article results in a producer of oil and/or gas in paying quantities, the well shall be operated at the expense of and for the account of the consenting parties. The consenting parties own and are entitled to receive all of the non-consenting parties' interest and share of production from the well until the proceeds equal 300 percent of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, and 300 percent of that portion of the cost of newly acquired equipment in the well which would have been chargeable to the non-consenting party if it had participated. According to Article VI.B.2, the proposing party must actually commence work on the proposed operation and complete it with due dili-

---

**10.** In Issue Four, we address Abraxas' argument that it is not liable for breach of contract damages because Appellees failed to obtain a finding that it acted with gross negligence or engaged in willful misconduct in breaching the JOA.

gence in order to be entitled to the benefits of Article VI. Finally, Article VII.D.3 prohibits the operator from undertaking any single project reasonably estimated to require an expenditure in excess of $30,000 except in connection with the drilling, reworking, deepening, completing, recompleting, or plugging back of a well which has been previously authorized by or pursuant to the JOA.

■ We first reject Abraxas' contention that the sending of the AFE could never violate the JOA. Abraxas is correct that an AFE is an estimate or budget of proposed expenses, but that is not its sole or even its primary function. The sending of an AFE triggers the consent/non-consent provisions of the JOA and puts the receiving parties to an election of participating in the proposal or suffering a substantial penalty in the event the proposed work results in a producing well. Therefore, if an AFE is unjustified under the facts, then it may constitute a breach of the JOA to send the AFE and put the parties to that election.

■ Abraxas next argues that the AFE letter was appropriate under the JOA because the proposed projects were a "reworking" of the wells within the provisions of Article VI. According to Abraxas, this is simply a matter of contract construction which may be decided by the court as a matter of law. Although Abraxas does not state this outright, if it is correct, the trial court erred in submitting Question Twelve to the jury. In essence, then, Abraxas challenges the submission of this issue to the jury, yet it did not object to its submission on this ground. The only objection raised to submission of the breach of contract issue pertained to the measure of damages. Further, Abraxas permitted Harold Eldridge to testify without objection as an expert witness regarding his conclusions that Abraxas breached the agreement by sending the AFE and that the operations proposed in the AFE did not constitute "reworking" within the meaning of the JOA. Abraxas proffered its own evidence through Stephen Wendel that the operations were "reworking" of the wells so that the AFE did not violate the JOA. Under the circumstances, we conclude that Abraxas has waived the complaint. See Tex.R.Civ.P. 274. Therefore, we will only address Abraxas' contentions that the evidence is legally and factually insufficient to support the jury's finding that it breached the agreement by sending the AFE.

■ In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex. 1965); Parallax Corp., N.V. v. City of El Paso, 910 S.W.2d 86, 89 (Tex.App.—El Paso 1995, writ denied). If any probative evidence supports the jury's determination, it must be upheld. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661–62 (Tex.1951); Parallax Corp., N.V., 910 S.W.2d at 89.

The test for factual insufficiency is set forth in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. Leibman v. Grand, 981 S.W.2d 426, 429 (Tex.App.—El Paso 1998, no pet.). It is for the jury to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. Leibman, 981 S.W.2d at 429; Carrasco v. Goatcher, 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). The jury's finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. Kimsey v. Kimsey, 965 S.W.2d 690, 700 (Tex.App.—El Paso 1998, pet. denied). The parlance used by the courts of appeals

is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *Kimsey,* 965 S.W.2d at 700, *citing Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30–31 (Tex. 1994); *Beall v. Ditmore,* 867 S.W.2d 791, 795–96 (Tex.App.—El Paso 1993, writ denied). Thus, we cannot substitute our judgment for that of the fact finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. *Kimsey,* 965 S.W.2d at 700. If, however, the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. *Id.*

▮▮▮ Article VI.B.1 expressly restricts reworking operations to wells that are not producing in paying quantity. In the context of an oil and gas lease, the term "production" has been construed to mean a well which pays a profit, however small, over operating and marketing expenses, even though it may never repay its costs and the enterprise as a whole may prove unprofitable. *Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 780 (1961); *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 691 (1959); *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 511 (1942); *Peacock v. Schroeder,* 846 S.W.2d 905, 908 (Tex.App.—San Antonio 1993, no writ). This definition should apply equally to the phrase "producing in paying quantity." Operating and marketing expenses include taxes, overhead charges, labor, repairs, and depreciation on salvable equipment, but not costs or expenses in connection with the original drilling of the well or reworking expenses. *Peacock,* 846 S.W.2d at 908 n. 2 *citing Archer,* 356 S.W.2d at 781 and *Pshigoda v. Texaco, Inc.,* 703

S.W.2d 416, 418–19 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.). Periodic cash expenditures incurred in the daily operation of a well (sometimes called out-of-pocket lifting expenses) are classified as operating expenses, while one-time investment expenses, such as drilling and equipping costs, are to be treated as capital expenditures. *Evans v. Gulf Oil Corp.,* 840 S.W.2d 500, 504 (Tex.App.—Corpus Christi 1992, writ denied); *Pshigoda,* 703 S.W.2d at 418. Reworking expenses are part of the capital investment. *Evans,* 840 S.W.2d at 504; *Pshigoda,* 703 S.W.2d at 419.

Harold Eldridge, a certified public accountant with thirty years of experience in the oil and gas industry including considerable experience in joint interest auditing, conducted an audit of the Cleo Smith lease joint interest account and prepared a written report of his findings. In the course of this audit, Eldridge evaluated whether Abraxas had complied with the JOA, including the non-consent provision found in Article VI. Consistent with the definition found in the above cited authorities, Eldridge explained that the type of activities typically subject to a consent/non-consent election in a JOA are not routine operating activities. He ultimately concluded that the sending of the AFE violated the JOA for two reasons. First, the proposed projects were not the types of work subject to the non-consent provisions of Article VI because they were routine repairs. Second, even if the work were of the type covered by Article VI, no single project exceeded $30,000 as required by Article VII.D.3. Eldridge pointed out that the projects proposed by Abraxas in the AFE were not subject to Article VI because none of them involved a reworking, deepening, or plugging back of the wells. Instead, the proposed work concerned routine, normal repairs to the wells which Abraxas had an obligation as operator to undertake without sending the AFE. Further, just a few months earlier Abraxas had done just that by completing identical work on the wells and had billed the non-

operating interest owners for their respective shares of the expenses through the joint interest billings. On cross-examination, counsel for Abraxas challenged Eldridge's definition of "rework" but he steadfastly refused to accept her definition that a reworking operation is whatever work is necessary to restore production. One of Abraxas' experts, Ron Britton, agreed with Eldridge's conclusion that the work proposed in the AFE was not subject to a non-consent election. Additionally, Stephen Wendel of Abraxas told Eldridge during an interview that "there had never been an event of non-consent for the lease." Eldridge understood Wendel to mean that he recognized this was not a consent/non-consent activity and that the AFE letter was inappropriate. Eldridge was also of the opinion that the AFE was not in compliance with the JOA because no single project proposed in the AFE exceeded $30,000 as required by Article VII. D.3.[11] Based on his experience of thirty years in the industry and his evaluation of all of the facts, Eldridge believed that not only was it improper for Abraxas to send the AFE under these circumstances, it constituted willful misconduct. Viewed in the proper light, the above testimony constitutes probative evidence sufficient to support a finding that the sending of the AFE letter breached the JOA. Therefore, the evidence is legally sufficient.

Considering the factual sufficiency of the evidence, Abraxas asserts that the work proposed in the AFE constituted "reworking" within the meaning of Article VI so that the AFE was proper. It points to no evidence in the record to support that claim. Our independent review of the record reveals that Robert Watson, president of Abraxas, referred to the proposed work as "workovers to restore production" or "working over" of the wells but he was not asked and he did not testify that it sat-

isfied the definition of a "rework" within the meaning of Article VI.B.1. According to Watson, Abraxas noticed that some of the interest owners had ceased paying their monthly bills for the lease operating expenses, so it sent the AFE letter to give them an opportunity to "opt out" or eliminate their obligation to pay their share of the expenses. Stephen Wendel of Abraxas also testified regarding his interpretation of the JOA but following an objection, the trial court gave the jury a limiting instruction that Wendel's testimony regarding the operating agreement did not constitute a legal opinion. Like Watson, Wendel testified that Abraxas sent the AFE letter to give the non-operating interest owners an opportunity to decide whether they wanted to continue in the operation of the lease. Wendel believed that the JOA permitted Abraxas, whenever it incurred expenses, to either bill its working interest partners for their share of the expense or send them an AFE letter. Thus, under Wendel's view, an AFE letter could be utilized in connection with ordinary operating expenses. Wendel defined "rework" and "reworking" to include work performed on a well after its completion in an effort to secure production where there has been none, restore production that has ceased, or increase production. Wendel denied Eldridge's claim that Wendel had admitted that the AFE was inappropriate. With regard to the joint interest billings that had not been paid by Appellees, Wendel admitted that the JOA permitted Abraxas to collect these amounts out of the revenues. As another option to proceeding under the non-consent provision, the JOA also allowed Abraxas to demand that the working interest owners pre-pay normal operating expenses. Abraxas did not elect to proceed under either of these provisions.

---

**11.** Article VII.D.3 reads as follows: "3. *Other Operations:* Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of Thirty Thousand Dollars ($30,000.00) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement. . . ."

Although Abraxas offered Wendel's testimony to contradict that of Eldridge, the force of the evidence is diminished given the trial court's limiting instruction. Further, the jury had before it evidence that Abraxas had previously completed this same type of work and had billed it as part of the ordinary operating expenses rather than treating it as a "rework" under the consent/non-consent provision. Although the evidence is conflicting, we are unable to conclude that the jury's finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. Accordingly, the evidence is factually sufficient. Issue Four (A) is overruled.

### Causation

In its second subargument under Issue Four, Abraxas maintains that the evidence is legally and factually insufficient to show that its sending of the AFE letter "proximately caused" damages to Appellees. The elements of a breach of contract claim are the existence of a valid contract; performance or tendered performance by the plaintiff; breach of the contract by the defendant; and damages to the plaintiff resulting from that breach. *Prudential Securities, Inc. v. Haugland,* 973 S.W.2d 394, 397 (Tex.App.—El Paso 1998, pet. denied); *McCulley Fine Arts Gallery, Inc. v. "X" Partners,* 860 S.W.2d 473, 477 (Tex.App.—El Paso 1993, no writ). In order to recover compensatory damages, the plaintiff must establish that he suffered some pecuniary loss as a result of the breach of the contract. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952); *Prudential Securities,* 973 S.W.2d at 397; *Braselton–Watson Builders, Inc. v. Burgess,* 567 S.W.2d 24, 28 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.). The evidence must show that the

damages are the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 687 (Tex.1981); *Prudential Securities,* 973 S.W.2d at 397; *Winograd v. Clear Lake City Water Authority,* 811 S.W.2d 147, 156 (Tex.App.—Houston [1st Dist.] 1991, writ denied).[12] The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery. *Prudential Securities,* 973 S.W.2d at 397; *Nelson Cash Register, Inc. v. Data Terminal Systems, Inc.,* 671 S.W.2d 594, 600 (Tex.App.—San Antonio 1984, no writ).

Abraxas argues that the mere sending of the AFE letter did not result in any damages to Appellees. However, the sending of the AFE letter triggered Appellees' contractual obligation to elect whether to participate in the cost of the proposed operations or suffer the 300 percent penalty specified in the JOA. When Appellees did not respond to the AFE, Abraxas immediately seized Appellees' interests in the Cleo Smith lease and began appropriating their earnings. Abraxas continued to withhold the earnings even though it did not complete the operations specified in the AFE. Still further, Abraxas retained their interests until the lease had no value. Consequently, the evidence is both legally and factually sufficient to establish that sending the AFE resulted in damages to Appellees. Issue Four (B) is overruled.

### No Finding of Gross Negligence or Willful Misconduct

In its third subargument, Abraxas asserts that the jury's failure to make a finding of gross negligence or willful misconduct in connection with its sending of the AFE letter precludes a finding of lia-

---

**12.** In submitting the causation question to the jury, the trial court used the phrase "proximately caused," and consequently, the parties have referred to that causal standard in their briefs on appeal. While proximate cause must be proven in a negligence action, it is not, precisely speaking, the causal standard applied in a suit for breach of contract. *Winograd,* 811 S.W.2d at 156. Therefore, we will measure evidentiary sufficiency against the proper standard.

bility for breach of contract. In making this argument, Abraxas relies on Article V.A. of the JOA which contains the following exculpatory clause:

> [Operator] ... shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

Guiberson responds that the exculpatory clause applies only to causes of action arising from lease operations and does not apply to the operator's breach of contract. This argument requires us to construe the exculpatory clause. A court may construe a contract as a matter of law if it is unambiguous and can be given a certain or definite legal meaning or interpretation. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). A contract is ambiguous when it is reasonably susceptible to more than one meaning or the meaning is uncertain and doubtful. *Towers of Texas, Inc. v. J & J Sys., Inc.*, 834 S.W.2d 1, 2 (Tex. 1992). Mere disagreement over the interpretation of a contract clause does not render it ambiguous. *Hill*, 964 S.W.2d at 139; *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 136 (Tex. App.—El Paso 1991, no writ). When the parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent from the agreement itself, not from the parties' present interpretation. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981); *Hill*, 964 S.W.2d at 139. In construing an unambiguous contract, a court should attempt to harmonize and give effect to all provisions so that none is rendered meaningless. *Coker*, 650 S.W.2d at 393; *Hill*, 964 S.W.2d at 139.

Generally, exculpatory clauses in a contract are utilized to exempt one party from future liability for negligence. *See Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267 (Tex.1974); *Crowell v. Housing Auth. of the City of Dallas*, 495 S.W.2d 887, 889 (Tex.1973); *Wilson v. Ferguson*, 747 S.W.2d 499, 503 (Tex.App.—Tyler 1988, writ denied). Such agreements are valid and enforceable unless one party is at a disadvantage in bargaining power. *Allright, Inc.*, 515 S.W.2d at 267; *Crowell*, 495 S.W.2d at 889. We have found no cases discussing exculpatory clauses exempting a party from liability for breach of contract.

We first find that the exculpatory clause is unambiguous, and therefore, we will construe it as a matter of law. As some evidence that the parties did not intend that the exculpatory clause apply to any and all claims, we note that the exculpatory clause is found in an article which concerns the operator's authority to conduct operations in the contract area. More significantly, the operator's limitation of liability is linked directly to imposition of the duty to act as a reasonably prudent operator, which strictly concerns the manner in which the operator conducts drilling operations on the lease. Accordingly, we conclude that the exculpatory clause is limited to claims based upon an allegation that Abraxas failed to act as a reasonably prudent operator and does not apply to a claim that it breached the JOA. Since the exculpatory clause does not apply and Appellees are not entitled to exemplary damages for breach of contract, Appellees were not obligated to prove gross negligence or willful misconduct. Issue Four (C) is overruled.

### Measure of Damages for Breach of Contract

Abraxas next complains that the trial court instructed the jury on the wrong measure of damages because the proper measure is lost profits rather than diminution in value of the Appellees' interest. In Question Fourteen, the court instructed the jury to consider only the following measure of damages:

The difference between the value of [Appellees'] respective proportionate interests in the Cleo Smith Lease immediately before and immediately after the occurrence(s) which constituted Abraxas' failure to comply, if any, with the Operating Agreement by sending [Appellees] the November 24, 1993, 'AFE' letter.

 Damages must be measured by a legal standard, and that standard must be used to guide the fact finder in determining what sum would compensate the injured party. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex.App.—Houston [14th Dist.] 1999, pet. denied), citing *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex.1973). The proper measure of damages is a question of law for the court and the court's charge should limit the jury's consideration to facts that are properly a part of the allowable damages. *Allied Vista*, 987 S.W.2d at 141. The facts of the case determine the proper measure of damages as well as any allowance offsets. *Vance v. My Apartment Steak House*, 677 S.W.2d 480, 481 n. 1 (Tex.1984); *Weitzul Const., Inc. v. Outdoor Environs*, 849 S.W.2d 359, 363 (Tex. App.—Dallas 1993, writ denied).

 The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 486 (1952); *Stamp–Ad, Inc. v. Barton Raben, Inc.*, 915 S.W.2d 932, 936 (Tex.App.—Houston [1st Dist.] 1996, no writ). By the operation of that rule, a party generally should be awarded neither less nor more than his actual damages. *Stewart*, 245 S.W.2d at 486. A nonbreaching party is generally entitled to all actual damages necessary to put it in the same economic position in which it would have been had the contract not been breached. *CDB Software, Inc. v. Kroll*, 992 S.W.2d 31, 37 (Tex.App.—Houston [1st Dist.] 1998, no pet.); *General Elec. Supply Co. v. Gulf Electroquip, Inc.*, 857 S.W.2d 591, 599 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Thomas C. Cook, Inc. v. Rowhanian*, 774 S.W.2d 679, 686 (Tex. App.—El Paso 1989, writ denied). Damages for breach of contract protect three interests: a restitution interest, a reliance interest, and an expectation interest. *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 247 (Tex.App.—San Antonio 1998, pet. denied); see *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 187 (Tex.App.—Austin 1998, pet. denied). A party's expectation interest is measured by his anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform. *Lafarge*, 977 S.W.2d at 187, citing RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981); *Coon v. Schoeneman*, 476 S.W.2d 439, 441 (Tex. Civ.App.—Dallas 1972, writ ref'd n.r.e.). To restore an injured party to the position he would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it. *Interceramic, Inc. v. South Orient Railroad Company, Ltd.*, 999 S.W.2d 920, 927–28 (Tex.App.—Texarkana 1999, no pet. h.); *Lafarge*, 977 S.W.2d at 187; *Mistletoe Express Serv. of Oklahoma City, Oklahoma v. Locke*, 762 S.W.2d 637, 638 (Tex.App.—Texarkana 1988, no writ).

Appellees offered expert testimony to establish their actual damages. Johnny Mulloy, a consulting petroleum engineer, explained that a working interest is a stream of anticipated income burdened by a stream of expenses. The projected future income stream can be estimated with some certainty because an oil and gas reservoir becomes depleted over time in a predictable manner known as a decline curve. When that income stream expires, the working interest expires with it. The market value of a working interest at a certain point in time can be calculated by subtracting projected lease operating expenses from the projected future income stream. Utilizing these concepts and ap-

plying them to the facts, Mulloy calculated the market value of the working interests both prior to and after the breach.

Citing *Nelson v. Data Terminal Systems, Inc.,* 762 S.W.2d 744, 747 (Tex. App.—San Antonio 1988, writ denied), Abraxas asserts that diminution in value is not a proper measure of damages. In *Nelson,* a breach of contract case, a franchisee sought to recover damages for the diminution in the value of his business caused by the franchisor's failure to renew the franchise agreement. The evidence demonstrated that the franchisee's potential customer base was eroded as a result of the non-renewal. The San Antonio Court of Appeals determined that diminution in the value of a business is not the proper measure of damages in a breach of contract case. *Nelson,* 762 S.W.2d at 748. We agree with the general rule stated in *Nelson,* but we find the instant case distinguishable because the measure of damages employed by the expert witness, and that contained in the jury question, is not diminution in the value of a business. Although the expert witness utilized the term "market value" and the trial court referred to "value" in the jury question, it is clear that the measure of damages utilized by Mulloy is consistent with the standard enunciated in *Interceramic, Lafarge,* and *Mistletoe* because it takes into account the projected earnings less the projected costs. Because the breach of contract resulted in deprivation of Appellees' income stream, it is appropriate to inquire into the value of that income stream before and after the breach in order to determine the actual damages. We find no error in the measure of damages. Issue Four (D) is overruled.

## FAILURE TO PERFORM PROPOSED WORK

In Issue Five, Abraxas challenges the legal and factual sufficiency of the evidence to support the jury's finding that it also breached the JOA by failing to perform all or substantially all of the work proposed in the AFE. Since we have already determined that sufficient evidence supports the jury's determination that Abraxas breached the JOA by sending the AFE, the judgment is supported by an independent ground. Consequently, we need not address this issue. Issue Five is overruled.

## ABRAXAS' COUNTERCLAIM

In Issue Six, Abraxas assails the trial court's refusal to submit its counterclaim against Hornburg and Hauter for suit on a sworn account. The elements of a suit on account are:

- the sale and delivery of merchandise or performance of services;
- the amount of the account is "just," that is, the prices charged are pursuant to an express agreement, or in the absence of an agreement, that the charges are usual, customary, or reasonable; and
- the outstanding amounts remain unpaid.

*Andrews v. East Texas Med. Ctr.-Athens,* 885 S.W.2d 264, 267 (Tex.App.—Tyler 1994, no writ); *Thorp v. Adair & Myers,* 809 S.W.2d 306, 307 (Tex.App.—Houston [14th Dist.] 1991, no writ).

Hornburg and Hauter first argue that the failure to submit the suit on sworn account issue to the jury is harmless because the jury found that Abraxas is not entitled to a setoff for any of its reasonable and necessary expenditures on the lease. However, the question submitted to the jury restricted the jury's consideration to expenditures after December 1, 1993. The unpaid lease operating expenses which Abraxas seeks to recover from Hornburg and Hauter were incurred and billed prior to December 1, 1993. Consequently, the jury's answer to the setoff question does not dispose of this issue.

Hornburg and Hauter do not dispute that Abraxas offered evidence in support of the first and third elements. Hornburg did not pay his lease operating expenses

for October and November 1993 of which $8,727.69 remained unpaid at the time of trial. Similarly, Hauter ceased paying her lease operating expenses in May of 1993. Evidence at trial established that she still owed Abraxas $17,390.46 for lease operating expenses incurred from May of 1993 through November of 1993. However, Hornburg and Hauter do assert that Abraxas failed to offer any evidence that the charges are usual, customary, or reasonable. Abraxas responds that Harold Eldridge, Appellees' expert, conducted an extensive audit of the joint interest billings for the period from October 1, 1992 through December 31, 1994 and found no exceptions pertaining to these bills. According to Abraxas, this evidence established the reasonableness of the charges. We disagree. Our review of Eldridge's audit report reflects that he reviewed the charges made to the joint account for the purpose of determining whether the charges were allowed by the JOA. Nothing in his report indicates that his audit also included consideration of the reasonableness of any of the charges. Because Abraxas failed to offer any evidence that the charges are usual, customary, or reasonable, the trial court did not err in failing to submit the issue to the jury. Issue Six is overruled.

## DUPLICATIVE ATTORNEYS' FEES

In Issue Seven, Abraxas contends that Appellees were awarded duplicative attorneys' fees because it received both attorneys' fees and exemplary damages, which included compensation for inconvenience and attorneys' fees. Since we have reversed the portion of the judgment awarding exemplary damages, there can be no double recovery of attorneys' fees. Issue Seven is overruled.

## ABRAXAS' ENTITLEMENT TO ATTORNEYS' FEES

In Issue Eight, Abraxas asserts that the trial court abused its discretion in denying Abraxas' request for attorneys'

fees made pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code. In connection with its counterclaim filed against Hornburg and Hauter, and later by suit against Guiberson, Abraxas sought a declaratory judgment that it was the operator of the Cleo Smith lease. It also sought attorneys' fees pursuant to Section 37.009 which provides:

> In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.

TEX.CIV.PRAC. & REM.CODE ANN. § 37.009.

The Declaratory Judgments Act does not require an award of attorneys' fees to the prevailing party. *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). Rather, it provides that the court "may" award attorneys' fees. *Id.* The statute thus affords the trial court a measure of discretion in deciding whether to award attorneys' fees. *Id.; Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex.1997). Article 37.009 imposes four limitations on the court's discretion: the fees awarded must be reasonable and necessary, which are matters of fact, and they must be equitable and just, which are matters of law. *Bocquet*, 972 S.W.2d at 21. Because the grant or denial of attorneys' fees is within the sound discretion of the trial court, its judgment will not be disturbed on appeal in the absence of a clear showing that it abused its discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985); *Sunday Canyon Property Owners Ass'n v. Annett*, 978 S.W.2d 654, 659 (Tex.App.—Amarillo 1998, no pet.). A trial court abuses its discretion if its decision is arbitrary, unreasonable, or if the court acted without reference to guiding legal rules and principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990). In reviewing a fee award under the Act, we must determine whether the trial court abused its discretion by awarding fees when there was insufficient evidence that the fees were

reasonable and necessary, or when the award was inequitable or unjust. *Bocquet,* 972 S.W.2d at 21. Conversely, in reviewing a trial court's decision to not award fees, we must examine whether the complaining party established not only that the fees sought are reasonable and necessary, but also that the award is equitable and just.

The jury found that Abraxas incurred reasonable attorneys' fees in the sum of $56,964 for preparation and trial. Abraxas argues that it partially prevailed on its declaratory judgment action since the trial court effectively found it to be the operator after December 1, 1993, and that as a result, the trial court abused its discretion in denying its request for fees. Abraxas points to no additional circumstances which render the trial court's failure to award fees inequitable or unjust. In balancing the equities, the trial court could have considered that Appellees prevailed on all of their claims against Abraxas and that the entire dispute arose due to Abraxas' willful misconduct in breaching the JOA in the first instance. If we stopped the analysis here, no abuse of discretion would be shown. *See Fuqua v. Fuqua,* 750 S.W.2d 238, 246 (Tex.App.—Dallas 1988, writ denied). Although we have sustained some of Abraxas' arguments on appeal, we are not persuaded that the issue of attorneys' fees must be remanded to the trial court for reconsideration. While Abraxas has escaped imposition of punitive damages because we found that Appellees are not entitled to maintain a negligent waste action, that does remove from the record the substantial evidence of Abraxas' misconduct as operator. Likewise, our determination on appeal that Appellees waived their contractual right to insist on a formal election so that Abraxas is the operator under the JOA does not tip the scales in favor of Abraxas or otherwise alter the analysis because Appellees still prevailed in their breach of contract action. Finding no abuse of discretion, Issue Eight is overruled.

## AFFIRMATIVE DEFENSES

In Issue Nine, Abraxas alleges that the trial court erred in failing to charge the jury on its affirmative defenses of estoppel and waiver in connection with the breach of contract issues. In its generic reference to the "contract issues," it is unclear whether Abraxas argues that the trial court should have submitted these affirmative defenses in connection with the formal election of the operator dispute or to the other breach of contract issues actually submitted to the jury. To the extent Abraxas' argument relates to the formal election of the operator issue, we have already determined that Abraxas established waiver as a matter of law, and therefore, this issue is moot. If Abraxas also argues that these defenses should have been submitted in connection with the breach of contract issues, it did not preserve the complaint. Abraxas did not submit any requested jury questions on these affirmative defenses. Instead, Abraxas submitted a proposed definition of estoppel in connection with its requested question on the sworn account claim, and proposed definitions of waiver, estoppel, modification, and ratification in connection with its requested question on whether it had been elected operator. It did not submit these proposed definitions in connection with any of the other breach of contract issues. Accordingly, Abraxas has waived these issues. TEX.R.CIV.P. 278; *Castillo v. American Garment Finishers Corp.,* 965 S.W.2d 646, 649 (Tex.App.—El Paso 1998, no pet.); *Lopez v. Southern Pacific Transp. Co.,* 847 S.W.2d 330, 333 (Tex.App.—El Paso 1993, no writ). Issue Nine is overruled.

## INDEPENDENT AND INTERVENING CAUSE

In its final issue for review, Abraxas contends that the trial court erred in denying its requested jury instruction on independent and intervening cause. Abraxas submitted a requested definition and ques-

tion on "new and independent cause" as it applied to the waste cause of action. Given our conclusion that Appellees are not permitted to maintain an action for waste but instead are restricted to their breach of contract claims, this contention is moot. Issue Ten is overruled.

## CONCLUSION

Having sustained Issues Two and Three, we delete the award of exemplary damages to Hornburg, Hauter, and Guiberson. Having overruled all other issues raised on appeal, we affirm the judgment of the trial court, as modified.