Affirmed and Opinion filed February 21, 2006









Affirmed
and Opinion filed February 21, 2006.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-01060-CV

____________

 

EXXON MOBIL
CORPORATION,
Appellant

 

V.

 

KINDER MORGAN
OPERATING L.P. AA@
F/K/A ENRON LIQUIDS PIPELINE OPERATING LIMITED PARTNERSHIP, KINDER MORGAN,
INC.; ONEOK BUSHTON PROCESSING, INC. F/K/A ENRON GAS PROCESSING CO. AND KN
PROCESSING, INC.; AND ENRON LIQUIDS PIPELINE CO. N/K/A KINDER MORGAN GP, INC., Appellees

 



 

On Appeal from the 189th
District Court

Harris County, Texas

Trial Court Cause No. 2000-05242

 



 

O P I N I O N








Exxon Mobil Corporation appeals from a
take nothing judgment in its lawsuit against Kinder Morgan Operating L.P. AA@ f/k/a Enron
Liquids Pipeline Operating Limited Partnership, Kinder Morgan, Inc.; ONEOK
Bushton Processing, Inc. f/k/a Enron Gas Processing Co. and KN Processing,
Inc.; and Enron Liquids Pipeline Co. n/k/a Kinder Morgan GP, Inc. (Aappellees@).[1]  In 1987, Exxon Mobil and appellees entered
into a Gas Processing Agreement under which appellees agreed to process Exxon
Mobil=s natural
gas.  In the present action, Exxon Mobil
sued appellees claiming, inter alia, breach of contract, conversion, fraudulent
inducement, and fraudulent concealment, all relating to the gas processing
relationship.  Exxon Mobil=s primary claim is
that appellees did not provide it with all of the propane to which it was entitled
from the natural gas.  The trial court
granted a directed verdict favoring appellees on the conversion claim.  The jury returned a verdict favoring
appellees on all remaining claims.  The
trial court entered a take nothing judgment in favor of appellees.  In three issues, Exxon Mobil contends that
(1) the jury=s verdict on the breach of contract claim
was against the great weight and preponderance of the evidence; (2) the trial
court erred in granting a directed verdict on the conversion claim; and (3) the
trial court commented on the weight of the evidence in front of the jury.  Under each issue, Exxon Mobil requests that
we reverse and remand for a new trial. 
We affirm.

Background








In 1987, Exxon Mobil produced natural gas
from the Hugoton Field in southwest Kansas. 
Appellees operated a gas processing plant in Bushton, Kansas.  The parties entered into a Gas Processing
Agreement (AGPA@), under which
appellees agreed to process Exxon Mobil=s Hugoton Field
gas.[2]  The GPA called for appellees to extract
liquid and liquefiable hydrocarbons, such as propane, butane, and natural
gasoline, out of the natural gas stream. 
These extracted hydrocarbons were then to be provided to Exxon Mobil as Aplant products@ based on certain
specified percentages.  The GPA also
required appellees to perform ABTU control
activities@ so that the remaining natural gas, or AResidue Gas,@ leaving the plant
would contain an average of no less than 950 BTUs per cubic foot.[3]  In order to account for the BTU control
activities, the percentage of extracted propane that the GPA allots to Exxon
Mobil was expressly made variable.  As
will be discussed in detail below, Exxon Mobil maintains that the GPA required
appellees to vary the amount of Exxon Mobil=s own propane
extracted or reinjected in order to meet the BTU requirements in the residue
gas stream.  Appellees assert that the
GPA permitted them to vary the amount of propane provided to Exxon Mobil as a
plant product to account for the BTU control activities but did not require
appellees to actually use Exxon Mobil=s propane for such
activities.[4]

The parties operated under the GPA until
1997, when they signed Amendment No. 3. 
This amendment removed the variability of the percentage of propane
received by Exxon Mobil in exchange for a fixed percentage, which was lower
than the potential amount in the original agreement but considerably higher
than what Exxon Mobil actually had been receiving.  The negotiations leading to Amendment No. 3
were prompted by auditing concerns raised by Exxon Mobil.  Exxon Mobil asserted that appellees were
required to measure propane at the tailgate of the plant, whereas appellees
apparently had been measuring in the middle of the plant prior to extraction of
inert compounds (such as helium and nitrogen), the presence of which would
decrease the share of propane attributable to Exxon Mobil.  In its brief, Exxon Mobil acknowledges that
the signing of Amendment No. 3 settled the claims relating to this alleged allocation
discrepancy.








Exxon Mobil contends that its auditors
ultimately discovered additional allocation discrepancies due to appellees= measuring propane
prior to the extraction of water, helium, and nitrogen.  On September 1, 2000, Exxon Mobil filed this
lawsuit.  During the discovery process
related to these initial claims, Exxon Mobil asserts that it learned that
appellees had been appropriating vast quantities of propane that should have
been provided to Exxon Mobil.  In short,
Exxon Mobil contends that appellees varied the amount of propane attributable
to Exxon Mobil to account for BTU control but did not actually use Exxon Mobil=s propane for BTU
control.  Instead, appellees extracted
the propane attributable to Exxon Mobil and swapped it for methane, which was
used to raise the BTUs of the residue gas stream as necessary.  Appellees, or entities related to appellees,
then sold the propane for a profit.  Exxon
Mobil claims that the difference between the value of the propane it was due
and the value of the propane it received was around $37 million.

Thus, the fundamental point of contention
in this lawsuit is as follows:  did  the provisions in the GPA mandating the
variance of the amount of propane attributable to Exxon Mobil require that its
propane actually be used for BTU control, or did those provisions merely
provide a method of accounting for BTU control without requiring that only
Exxon Mobil=s propane be used for such control
activity?

The trial court granted a directed verdict
favoring appellees on Exxon Mobil=s conversion
claim.  The breach of contract,
fraudulent inducement, and fraudulent concealment claims were submitted to the
jury, which returned a verdict favoring appellees on those claims.  Accordingly, the trial court entered a take
nothing judgment favoring appellees.  On
appeal, Exxon Mobil contends that (1) the jury=s verdict on
breach of contract was against the great weight and preponderance of the
evidence; (2) the trial court erred in granting a directed verdict on the
conversion claim; and (3) the trial court commented on the weight of the
evidence in front of the jury.[5]

 








Breach of Contract

In its second issue, Exxon Mobil contends
that the jury=s verdict on the breach of contract claim
was against the great weight and preponderance of the evidence.[6]  We utilize the normal standards of review in
considering this factual sufficiency challenge. 
See Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex.
2001).  Exxon Mobil specifically attacks
the jury=s negative answer
to Question No. 2 in the charge, which reads as follows:

QUESTION NO. 2

Did any defendant fail to comply
with the Gas Processing Agreement?

In answering this question, you are to consider only
whether [Exxon Mobil] received the number of gallons of plant products that it
was entitled to under the terms of the 1987 Gas Processing Agreement.

This question clearly refers to a particular section
of the contract, paragraph 10.03, which provides:

10.03 The number of gallons of each Plant Product to
which [Exxon Mobil] is entitled shall be determined by multiplying the
theoretical gallons of each such Plant Product by the applicable recovery
factor shown below, and the fees therefor shall be calculated pursuant to
paragraph 11.01 hereof.

 

Without BTU Control

Ethane B                                   0%

Propane B                       up
to  88%*

Iso-Butane B                             98%

Normal
Butane B                        98%

Natural
Gasoline B                     95%

*varied, as
necessary, in order to meet Mobil=s Transporter=s F.E.R.C. BTU
tariff requirements.








The GPA defined Aplant products@ as Athe hydrocarbons
in liquid and liquefiable form extracted and saved from Gas processed at the
Plant.@  Propane is the only plant product that Exxon
Mobil contends it was entitled to but did not receive in the correct quantity.  Under paragraph 10.03, Exxon Mobil was
entitled to as much as 88% of the propane theoretically produced from its gas
minus the amount that would be required to enhance the BTUs of the residue gas.[7]








Exxon Mobil=s theory is that
appellees breached the GPA by using methane instead of propane to enhance BTUs
in the residue gas stream, retaining the propane that should have been used for
BTU control, and selling that propane for a profit.  However, even if Exxon Mobil is correct that
appellees should have used propane attributable to Exxon Mobil and not methane
from another source for BTU control, the propane in question should not have
been Aextracted and
saved@ as a plant
product; it should have been left in (or reinjected into) the residue gas
stream.  In other words, it was logical
for the jury to conclude that under the GPA, Exxon Mobil would not have been
entitled to receive as a plant product the propane that it claims should have
been used for BTU control.  At most,
Exxon Mobil would have been entitled to have the propane left in or reinjected
into the residue gas stream.  Question
No. 2, the sole breach of contract question in the charge, permitted the jury
to find a breach of contract only if Exxon Mobil proved that it did not get all
of the plant products to which it was entitled.  The charge did not permit the jury to find a
breach of contract simply on evidence that methane was used instead of Exxon
Mobil=s propane to
control BTUs in the residue gas stream.[8]  Exxon Mobil does not allege charge error on
appeal.  Under the GPA, it was entitled
to two things: (1) a residue gas stream with 950 BTU and (2) plant products,
including propane in excess of the amount that would be required to achieve the
950 BTU requirement.  Under Exxon Mobil=s own theory, the
jury could have logically concluded that Exxon Mobil would not have been
entitled to any more propane as a plant product than what it received.[9]  Accordingly, we find that the jury=s answer to
Question 2 was not against the great weight and preponderance of the
evidence.  We overrule Exxon Mobil=s second issue.

Conversion

In its first issue, Exxon Mobil contends
that the trial court erred in granting a directed verdict against its
conversion claim.  A trial court may
direct a verdict when either (1) a plaintiff fails to present evidence raising
a fact issue essential to its right of recovery, or (2) the evidence
conclusively establishes a defense to the plaintiff=s cause of
action.  Prudential Ins. Co. of Am. v.
Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000).  In reviewing the grant of a directed verdict,
we follow the normal standards for assessing the legal sufficiency of the
evidence.  City of Keller v. Wilson,
168 S.W.3d 802, 809‑828 (Tex. 2005).








In their motion for directed verdict,
appellees asserted several grounds, including that Exxon Mobil=s conversion claim
was barred by the independent injury rule.[10]  This rule takes into account the fact that
contractual relationships between parties sometimes create duties under both
tort and contract law.  Under the rule,
if the defendant=s conduct would give rise to liability
independent of the fact that a contract exists between the parties, the
plaintiff=s claim may sound in both tort and
contract, but if the defendant=s conduct would
give rise to liability only because it breaches the parties= agreement, the
plaintiff=s claim ordinarily sounds only in
contract.  Southwestern Bell Tel. Co.
v. DeLanney, 809 S.W.2d 493, 494 (Tex. 1991).  The nature of the claimed injury usually
determines whether the breached duty lies in tort or contract.  Jim Walter Homes, Inc. v. Reed, 711
S.W.2d 617, 618 (Tex. 1986).  When the
only loss or damage is to the subject matter of the contract, the plaintiff=s action is
ordinarily on the contract.  DeLanney,
809 S.W.2d at 494-95.  Further, when the
contract spells out the parties= respective rights
about a subject matter, the contractCnot common law
tort theoriesCgoverns any dispute about the subject
matter.  See DeWitt County Elec.
Co-op., Inc. v. Parks, 1 S.W.3d 96, 105 (Tex. 1999).[11]








With these guidelines in mind, it is
important to consider exactly what Exxon Mobil claims as its injury.  Each of several possible ways to state Exxon
Mobil=s claim
demonstrates that the claim is based in contract and not tort.  As discussed above, under the GPA, appellees
agreed to extract liquid and liquefiable hydrocarbons (including propane) from
Exxon Mobil=s gas (or the percentage of the comingled
gas stream attributable to Exxon Mobil). 
The parties also agreed that the amount of propane to which Exxon Mobil
would be entitled would be Avaried, as
necessary, in order to meet@ the minimum BTU
requirements, i.e., Exxon Mobil would receive less propane as a plant
product to the extent BTUs in the residue stream needed to be enhanced.  As also discussed above, under its contract
claim, Exxon Mobil asserted that appellees breached the GPA by extracting and
keeping the propane and using methane instead of propane to control BTUs in the
residue gas stream.  In its conversion
claim, Exxon Mobil asserts that appellees converted its propane by keeping it
instead of giving it to Exxon Mobil as a plant product.[12]  Stated another way, Exxon Mobil essentially
argues that the manner in which appellees performed their obligations under the
contract converted one of the very products that the contract was entered into
to produce (or extract).   In essence,
Exxon Mobil claims that it did not receive all of the propane that it was
entitled to under the GPA.  Regardless of
how they are phrased, Exxon Mobil=s contract and
conversion claims are simply the same factual claim stated alternatively under
contract and tort theories.








 While it is true that the commodity that Exxon
Mobil contends appellees converted existed prior to the GPA in the sense that
the hydrocarbon molecules existed in the gas stream, the propane did not exist
as a processed plant product before the existence of the GPA.  Indeed, the very point of the GPA was the
extraction of such commodities into useable form, i.e., appellees
processed the gas stream such that propane and other liquid and liquefiable
hydrocarbons were extracted as plant products. 
If there had been no contract, there would have been no extracted
propane in appellees= possession.   Two things are clear: (1) the only loss
Exxon Mobil complains of is the propane, which is the subject of the contract, see
DeLanney, 809 S.W.2d at 494-95; and (2) the contract spells out the
parties= respective rights
regarding the processing of the propane, see DeWitt County Elec. Co-op.,
1 S.W.3d at 105.[13]

Certainly, as Exxon Mobil suggests, a
legal duty generally exists in tort for one party not to convert the property
of another party, which is separate and apart from any contractual relationship
between the parties; however, the analysis does not end there and could not end
thereCotherwise, there
would be no independent injury rule.  In DeWitt,
landowners sued a utility company alleging that it negligently cut down trees
in its right-of-way.  1 S.W.3d at
99.  The court held that even though the
landowners could have brought a negligence action if no agreement regarding the
right-of-way had existed between the parties, because such an agreement
existed, the agreement and not common law tort principles governed the
dispute.  Id.  at 105. 
Similarly, in Abraxas Petroleum Corp. v. Hornburg, working
interest owners in an oil field sued the production company, alleging, among
other things, the common law tort of waste. 
20 S.W.3d 741, 747-49 (Tex. App.CEl Paso 2000, no
pet.).  The court held that because the
parties had a contract governing the production company=s conduct in
regard to production of oil from the field, the cause of action was one for
breach of contract and not for common law waste.  Id. at 752-53.   In this case, because the rights of the
parties in regard to the propane are governed by the agreement between them,
Exxon Mobil=s claim sounds in contract, not in common
law tort.








The very nature of the dispute between the
parties was whether appellees legally performed their contractual obligations
under the GPA.  Appellees have
conclusively demonstrated that Exxon Mobil=s conversion
claims were barred by application of the independent injury rule.  Accordingly, the trial court did not err in
granting a directed verdict against this claim. 
Exxon Mobil=s first issue is overruled.

Trial Judge=s Conduct

In its third issue, Exxon Mobil contends
that the trial judge commented on the weight of the evidence in front of the
jury.  The discretion vested in the trial
court over the conduct of a trial is great, and the judge has authority to
express himself or herself in exercising this broad discretion.  Dow Chem. Co. v. Francis, 46 S.W.3d
237, 241 (Tex. 2001).  Texas judges,
however, are prohibited from commenting on the weight of the evidence.  In re M.S., 115 S.W.3d 534, 538 (Tex.
2003).  A trial court comments on the
weight of the evidence when it indicates an opinion as to the verity or
accuracy of the facts in inquiry.  Vickery
v. Vickery, 999 S.W.2d 342, 380 (Tex. 1999).

Exxon Mobil specifically argues that the
trial judge commented on the weight of the evidence when he:  (1) admonished Exxon Mobil=s counsel during
closing argument; (2) interacted with witnesses while they were being examined
by counsel; and (3) discussed the case with the attorneys during a break in the
trial.  We discuss each argument in turn.

 Exxon Mobil first complains about the
following exchange, during Exxon Mobil=s closing
argument, regarding appellees= swapping of
propane for methane:

[COUNSEL]: That document tells you what they were doing
with that excess stuff.  So they had
another contract that they didn=t tell us about. 
They didn=t need to.  But they didn=t put our name on it because this
is an illegitimate business deal and they were covering it up.  If it were a legitimate deal, all of these
exhibits would have been out in open [sic]. 
The swap agreement.  They would
have asked our consent and put our name on it and they would have had the swap
agreement in that room.








THE COURT:          Counsel, confine yourself to the evidence.  There is no evidence this was an illegitimate
deal.  That=s unsupported
argument.

The record does not demonstrate that Exxon Mobil
objected to the trial court=s comments.  A party waives appellate review when it fails
to object to a trial judge=s comments and
request an instruction to disregard unless the comment could not have been
rendered harmless by an instruction.  Francis,
46 S.W.3d at 241; see also Capellen v. Capellen, 888 S.W.2d 539, 547
(Tex. App.CEl Paso 1994, writ denied) (AUnless the comment
by the judge is so blatantly and obviously prejudicial that it cannot be cured,
an objection and request for instruction must be made in order to preserve
error.@).[14]

It is unclear whether the trial judge was
stating that there was no evidence that the swap agreement itself, between two
separate but related entities, was illegitimate, or that there was no evidence
that the very swap of methane for propane was illegitimate in the context of
the GPA between appellees and Exxon Mobil.[15]  It appears more likely that he was referring
to the swap agreement between the related entities.  Exxon Mobil does not cite to any evidence
that this swap agreement standing alone was illegitimate.  Accordingly, we cannot say that the judge=s comment was so
blatantly and obviously prejudicial that an instruction would not have cured
it.








Exxon Mobil next complains about the judge=s interaction with
certain witnesses during trial.  Generally,
a Texas trial judge should not engage in substantive questioning of
witnesses.  Pitt v. Bradford, 843
S.W.2d 705, 708 (Tex. App.CCorpus Christi
1992, no writ).  However, under certain
circumstances, a judge may attempt to paraphrase and clarify a witness=s answer.  Born v. Va. City Dance Hall & Saloon,
857 S.W.2d 951, 956-57 (Tex. App.CHouston [14th
Dist.] 1993, writ denied).  Exxon Mobil specifically
points to three instances in which the judge interacted with witnesses.

The first occurred while Exxon Mobil=s counsel was
questioning an Exxon Mobil auditor:

Q:      How do you know the processor didn=t need that for our residue stream
to meet this requirement at the tailgate of the plant?

A:      Well, if he needed it he would have
reinjected it, and he didn=t.  Or else he didn=t meet the tariff to begin with.

Q:      Okay.

. . . .

THE COURT:          Do you have personal knowledge of that
or is that something you deduce?

THE
WITNESS:      Well, either one of [sic]
the other happened, either they were able to meet the tariff and not inject it
or didn=t inject it and didn=t meet the tariff.  Those are the two options.

THE COURT:          Well, what=s troubling me is we have heard
about propane coming from other sources, and it seems to me that the tariff
could have been met from other sources and you just told us this was all
calculated.

THE
WITNESS:      I=m not aware of any propane coming
from any other sources and entering before the tailgate of the rich stream.

THE COURT:          Other producers, other gas streams,
things like that, people would have different contracts that you didn=t audit?

THE WITNESS:      They may very well have met the tariff that way.  But if they met it that way, then they didn=t meet ours.








Exxon Mobil again did not object to the trial court=s comments.  On appeal, it contends that the court=s latter two
statements were particularly troublesome because they indicated that (1) the
court was concerned about the state of Exxon Mobil=s evidence and (2)
there may have been other methods for the defendants to have complied with the
contract.  Exxon Mobil, however, provides
no explanation as to why meeting the tariff with propane from other sources
would not have fulfilled the contract. 
Nor does it explain why fulfilling the contract  with 
propane from others sources would have been damaging or troubling to
Exxon Mobil.  Accordingly, we cannot say
that the court=s comments were so blatantly and obviously
prejudicial that an instruction would not have cured them.

The second witness interaction occurred
when Exxon Mobil=s counsel was cross-examining a defense
witness.

Q:      So the only way Mobil would know how you=re operating in that plant and what
the BTU content is and how much you=re getting out of gas and all those things, they are going
to have to rely on you for that information, aren=t they?

A:      The plant operation doesn=t matter.  This contract is a fixed recovery contract
based on what Mobil puts into the system.

[COUNSEL]:          May
I get an instruction to answer the question, please?

THE COURT:          I think there=s an implied
answer in his question Mr. Kenney [sic]. 
And question was Mobil is going to have to rely on you to know how you=re operating this
plant.  His answer suggests Mobil doesn=t need to know how
they are operating the plant, they just need to know whether the contract is
being complied with.  That=s what I hear him
saying.  So ask another question.








Again Exxon Mobil made no objection.  Exxon Mobil contends that the judge=s comment   suggested that the defendants were not
fraudulently concealing information. 
However, Exxon Mobil offers no explanation for this conclusion.  In the absence of such explanation, we are
without a basis on which to say that the court=s comment was so
prejudicial that an instruction would not have cured it.[16]

In the third witness interaction, the
judge asked a question to a defense witness immediately after the defense
finished their questioning of the witness and rested their case.

THE COURT:          Mr. Gifford, I have a question.  I don=t know whether this is really in your area or not.

THE
WITNESS:      Uh-huh.

THE COURT:          The contract provides in paragraph
2.03, says: AThe residue gas attributable to
Mobil=s gas and delivered to the
processor, to Mobil=s transporter pursuant to theC delivered by processor to Mobil=s transport@C

[COUNSEL]:          Your Honor, may we have a side-bar at
this point?

THE COURT:          No. 
I want to ask a question.

[COUNSEL]:          I understand.  And I have objection to that, your
Honor.  If we may have a conference at
the bench.

THE COURT:          All right.

(Bench conference.)

THE COURT:          Was it your jobCwere you supposed to audit the
tailgate of the pipeline to determine whether the monthly average met this 950
BTU tariff?

THE WITNESS:      I don=t recall ever auditing that number.  It=s notCI don=t know if that was
our responsibility or not, but I know we didn=t really audit
that number.  And again, Dave Yarbrough,
to me, knew more about the gas than I did and he never had a problem with it.








We first consider whether counsel=s statement that
he had an objection was sufficient to preserve the issue for review.  To begin with, it is unclear whether counsel=s objection was to
the fact that the judge wanted to ask a question or to the substance of the
question itself.  Given that counsel had
not previously objected when the judge asked the questions Exxon Mobil now
complains of, it appears more likely that counsel was objecting to the nature
of this question.  Further, after an
off-the-record bench conference, the judge apparently proceeded to ask a
different question than the one he had begun to ask before counsel
objected.  Counsel did not renew his
objection.  Thus, the logical inference
is that counsel did not have an objection to the substance of the judge=s second question.

Exxon Mobil insists, however, that the
judge=s last question
served to rehabilitate the witness, who was a disgruntled former employee
according to Exxon Mobil.  It suggests
that because the judge Aturned to@ this witness for Atruthful information
about the contract and the audits,@ he rehabilitated
the witness in the eyes of the jury.  To
the extent the judge=s question could potentially have had such
an impact, we do not believe that the question Awere you supposed
to audit the tailgate of the plant@ was so
prejudicial that it could not have been overcome by an instruction to
disregard, particularly in light of the witness=s answer, AI don=t know.@








Lastly, Exxon Mobil maintains that the
trial judge engaged in a tirade against its counsel within the possible hearing
of the jury.[17]  In support of this claim, Exxon Mobil cites
to the testimony of one of its own paralegals who testified that while the
judge was speaking over the microphone: 
(1) he (the paralegal) saw that the jury room door opened and closed
approximately three times, (2) he saw one juror standing at the door at one
point, and (3) he saw another juror walk through the back of the
courtroom.  He admitted, however, that he
did not know if any of the jurors heard any of the judge=s comments.  Thus, there is no persuasive evidence that
any of the jurors heard the judge=s allegedly
improper comments.  In the absence of
evidence establishing that any of the jurors heard the judge=s comments, we
decline to hold that the possible effect of the comments merits a new trial.[18]  Based on the foregoing reasons, we overrule
Exxon Mobil=s third issue.

The trial court=s judgment is
affirmed.

 

 

 

 

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

Judgment
rendered and Opinion filed February 21, 2006.

Panel
consists of Chief Justice Hedges, Justice Yates, and Senior Chief Justice
Murphy.[19]











[1]  Appellees are
various related entities, each of which participated in some fashion in the
agreement underlying Exxon Mobil=s
claims.  The agreement was originally
entered into by Mobil, prior to its merger with Exxon.  Because the parties make no arguments
concerning or depending upon when any particular entity was involved in
performance of the contract, we shall use the terms Aappellees@ and AExxon Mobil@ to
refer to any or all of the respective parties.





[2]  The gas
produced by Exxon Mobil from the Hugoton Field was immediately comingled with
the natural gas of other producers as soon as it entered the pipeline operated
by Exxon Mobil=s transporter. 
Thus, the gas that entered and the gas that exited appellees= Bushton plant was always comingled gas from several
producers.  In light of this fact, the
GPA required all measurements and compositional analysis to be done at the
wellhead before Exxon Mobil=s gas entered the comingled stream.





[3]  BTUs (ABritish Thermal Units@) are
units of measuring heating capacity.  Webster=s Third New International
Dictionary 279, 287 (1993).





[4]  The parties
agree that under the GPA, to the extent BTUs in the residue gas needed to be
enhanced, the amount of propane attributable to Exxon Mobil as a plant product
was to be reduced.





[5]  Although the
GPA specified that the laws of Kansas would govern its interpretation, the
parties agree that there are no material differences between Texas law and
Kansas law relevant to matters at issue in this case.  Accordingly, we will analyze the issues in
accordance with Texas law.  See, e.g.,
Greenberg Traurig of N.Y., P.C. v. Moody, 161 S.W.3d 56, 69-70 (Tex. App.CHouston [14th Dist.] 2004, no pet.).





[6]  We will first
discuss Exxon Mobil=s second issue, concerning breach of contract.  We will then discuss its first issue,
concerning conversion.





[7]  The parties
dispute whether the trial court found the contract to be ambiguous or
unambiguous.  The trial court did not
expressly rule either way.  It instructed
the jury that it should find a breach of contract only if Exxon Mobil did not
get all the plant products to which it was entitled.  Exxon Mobil does not contend that this charge
was in error.  Therefore, in assessing
the factual sufficiency of the evidence, we examine the evidence in light of
the charge as submitted.  Osterberg v.
Peca, 12 S.W.3d 31, 55 (Tex. 2000). 
To the extent that our review requires us to interpret the contract, our
primary concern is ascertaining the true intent of the parties.  Zurich Am. Ins. Co. v. Hunt Petroleum
(AEC), Inc., 157 S.W.3d 462, 465 (Tex. App.CHouston
[14th Dist.] 2004, no pet.) (citing Heritage Res., Inc. v. NationsBank,
939 S.W.2d 118, 121 (Tex. 1996)).  We
examine the entire agreement when interpreting a contract, giving effect to all
the contract=s provisions so that none are rendered meaningless.  Stine v. Stewart, 80 S.W.3d 586, 589
(Tex. 2002).  We assign terms their
plain, ordinary, and generally accepted meanings unless the instrument shows
that the parties used them in a technical or different sense.  Heritage Res., 939 S.W.2d at 121.





[8]  Regarding
propane in the residue gas stream, please see note 12, infra. 





[9]  In addition to
paragraph 10.03, several other sections of the contract support this
conclusion.  Paragraph 1.14 defined Aresidue gas@ as Athat volume of gas remaining after the extraction
therefrom of Plant Products and Plant Fuel requirements.@  Thus, any
propane molecules remaining in the residue stream after processing would not
constitute Aplant product@ but
would be part of the Aresidue gas.@  Paragraphs 2.03, 6.05, 9.02, and 11.01
additionally suggest that Exxon Mobil was entitled only to propane that was
extracted as plant products and not varied as necessary for BTU control
(whether actually used for BTU control or not). 
Under paragraph 2.03, appellees committed to Aextract, separate and save@ plant products from Exxon Mobil=s gas and to enact BTU control activities.  Paragraph 6.05 required appellees to provide
the Aextracted Plant Products attributable to [Exxon Mobil=s] Gas@ to Exxon Mobil at the tailgate of the Bushton
Plant.  Paragraph 9.02 required appellees
to extract plant products such that the heating value of the residue gas would
meet certain minimum requirements. 
Paragraph 11.01 provides that appellees were to be compensated Afor each gallon of recovered plant products.@





[10]  Exxon Mobil
suggests that the trial court specifically granted the directed verdict solely
on the ground that the conversion claim was not supported by legally sufficient
evidence.  We disagree.  To begin with, the court=s judgment does not state the basis on which the court
granted the directed verdict. 
Furthermore, the judge=s comment during the charge conference that he did not
think the evidence supported Exxon Mobil=s
proposed conversion submission does not necessarily indicate that legal
sufficiency was the sole ground on which he based the directed verdict.  The judge additionally stated that the issue
was governed by the contract, which indicates that he also may have accepted
appellees= independent injury rule argument.





[11]  We reject
Exxon Mobil=s suggestion that the independent injury rule operates
only to bar claims asserting negligent performance of a contract.  If this were true, it appears likely that the
supreme court would have stated so in DeWitt, DeLanney, or Reed.  Instead, the court set forth the analytical
framework that we discuss and apply in this opinion.





[12]  It is interesting
but not essential to note that at no point has Exxon Mobil suggested that the
residue gas stream was unfit for its intended purpose or of an inferior quality
because it contained methane instead of propane.  Neither in its briefing nor in its oral
presentation before this court has Exxon Mobil made any representations
regarding the residue stream, except for one undeveloped reference that the
BTUs may not have always met the minimum requirement.

Additionally, it would appear that if the amount of propane
in the residue gas stream was important to Exxon Mobil, it could have measured
this amount, but there is no evidence that it ever did so in ten years of
operating under the GPA.  Exxon Mobil
asserts that in one of its audits, it requested a gas chromatograph at the
tailgate of the gas plant, which would have revealed the constituent
percentages of the stream, but appellees refused to permit this test.  However, Exxon Mobil does not explain why, if
the makeup of the stream was important to it, it could not have tested it at
another location on the pipeline.  Nor do
they explain why they asked for this only once in ten years and apparently did
not pursue the issue after appellees refused to permit it.

Further, Exxon Mobil offers no explanation
as to why the reinsertion of propane into the gas stream would have been
important to it apart from BTU control, which was achieved by insertion of a
different hydrocarbon.  Typically,
residue gas streams from natural gas processing plants are then sold as useable
natural gas.  Exxon Mobil points to no
evidence that it would have done anything different with the residue gas stream
or would have received any increase in profits had the residue gas stream
contained more propane than it did.





[13]  It is
interesting to note that although Exxon Mobil continually asserts that
appellees had no right to any of the propane and that title to the propane
always remained with Exxon Mobil, the contract itself specifies that at most,
Exxon Mobil could recover 88% of the propane attributable to its natural gas,
even if there was no need for BTU control. 
The remainder, according to at least one Exxon Mobil witness and a
logical interpretation of the contract, went to appellees.  This further confirms that the rights of the
parties to the propane were governed by the GPA.





[14]  In its brief,
Exxon Mobil asks, AIs a trial judge who makes comments such as these
likely to immediately sustain an objection to them?@  With this
query, Exxon Mobil appears to be arguing that the trial judge=s comments indicate he was so predisposed against it
that he could not possibly see the error of his ways, assuming he had
erred.  However, Exxon Mobil provides no
authority to support such an analysis, and we do not assume that a trial judge
would not reconsider erroneous conduct given the opportunity.  The rule is that to preserve error, an
objection must be made to a trial judge=s
comments and an instruction requested unless the comment could not have been
rendered harmless by an instruction.  Francis,
46 S.W.3d at 241; Capellen, 888 S.W.2d at 547.





[15]  Appellees
suggest that counsel=s reference to an Aillegitimate
business deal@ was intended to remind jurors of the Enron accounting
scandals, and as such may have violated the trial court=s limine order. 
In its briefing, Exxon Mobil suggests that the swap agreement was a Amark-to-market@
transaction.  Such transactions were,
indeed, at the heart of some of the Enron accounting scandals.  E.g., Peter T. Muchlinski, Enron
and Beyond: Multinational Corporate Groups and the Internationalization of
Governance and Disclosure Regimes, 37 Conn. L. Rev. 725, 732-33 (2005).





[16]  Exxon Mobil
additionally notes another interaction with another witness but offers no argument  as to why that interaction was
inappropriate.  Not all questioning of
witnesses by a trial judge is necessarily improper.  See Born, 857 S.W.2d at 956-57.





[17]  Exxon Mobil
may have preserved this issue by moving for a mistrial, which the trial judge
denied.  The judge sua sponte instructed
jurors to disregard any of his comments that they may have overheard.





[18]  Exxon Mobil suggests that Rule
327(b) of the Texas Rules of Civil Procedure and Rule 606(b) of the Texas Rules
of Evidence would have prevented any of the jurors from testifying regarding
what he or she may have heard.  Tex. R. Civ. P. 327(b); Tex. R. Evid. 606(b).  We disagree. 
Rules 327(b) and 606(b) apply only to post‑verdict juror testimony
and prohibit only testimony regarding any matter or statement occurring during
deliberations or regarding the effect of anything upon a juror=s mind or emotions in connection
with deliberations.  Golden Eagle
Archery, Inc. v. Jackson, 24 S.W.3d 362, 370, 375 (Tex. 2000).  If a problem develops during trial, the court
may question the jury by voir dire and take corrective measures such as
instructing the jury, dismissing particular jurors, or declaring a
mistrial.  Id. at 375.  Nothing in the rules would prohibit a juror
from testifying that he or she had heard the judge=s comments, which came about
halfway through the trial and not during deliberations.  See Tex.
R. Civ. P. 327(b); Tex. R. Evid. 606(b);
Golden Eagle Archery, 24 S.W.3d at 370; Strauss v. Cont=l
Airlines, Inc., 67 S.W.3d 428, 448
(Tex. App.CHouston [14th Dist.] 2002, no pet.).





[19]  Senior Chief
Justice Paul Murphy sitting by assignment.